CHARLES H. LAMBDIN ET AL. *v.* HARRIET H. ROBINSON DANTZEBECKER, Trustee

[No. 14, October Term, 1935.]

*Decided November 6th, 1935.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, and SHEHAN, JJ.

*Milton Tolle* and *Victor I. Cook,* for the appellants.

*Eldridge Hood Young,* with whom were *Young & Crothers* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Ruth S. Dyott died at the home of her brother-in-law, Maurice Dyott, at St. Michaels in Talbot County, Maryland, on Tuesday, June 27th, 1933, as the result of a painful and protracted illness. She left to survive her three brothers, Joseph A. Lambdin, since deceased, Charles H. Lambdin, and George H. Lambdin, and a sister, Harriet H. Robinson Dantzebecker.

On the 26th day of the January preceding her death, she and Harriet H. Robinson Dantzebecker, herein called "Harriet Robinson," executed a trust agreement, herein called "Declaration No. 1," under which she delivered certain stocks, bonds, mortgages, and other securities to Harriet Robinson, to hold in trust to pay the net income therefrom to Ruth S. Dyott during her life and at her death to distribute them to certain named beneficiaries, among whom were Charles H. Lambdin, Joseph A. Lambdin, and Harriet Robinson. That instrument was in two parts. One part, called herein part "A," consisted of a declaration of trust signed and sealed by Harriet Robinson in which she declared that she had received the property and securities scheduled therein in trust for the uses and purposes set forth in the instrument, and each page of that part of the instrument was signed on the margin by Ruth S. Dyott. The second part, called herein part "B," which was attached to the first, and executed by Ruth S. Dyott, was in the following form:

"I, the undersigned, do hereby declare that I have delivered the above mentioned securities to the said Harriet H. Robinson for the purposes in said Declaration of Trust set forth, and I hereby authorize and empower her to do every act above named by me to transfer unto her all said securities above mentioned in the same manner as if I were present to execute the same, and this is her authority to do so, until otherwise directed.

"As Witness my hand and seal this 26th day of January, 1933.

"Ruth S. Dyott [Seal]

"Witness to Signature:

"C. Wilbur Stewart, M. D."

Following the execution of that instrument, Mrs. Dyott requested the trustee to sell two bonds scheduled in the agreement, which was done. On May 11th of the same year, she addressed a letter to the trustee, in which she stated that in that transaction the trustee had carried out the donor's wishes, and relieved her of the duty of disposing of those bonds, saying in the concluding part of the letter: "The proceeds of sale are to be invested by you and by subsequent agreement we will arrange how this item is to be held and disposed of."

On June 26th, 1933, Harriet Robinson executed a second deed or declaration of trust, herein called "declaration No. 2," the effect of which was to largely increase the gifts provided for her in the first trust agreement, and to diminish those provided for her brothers. The second trust instrument was identical in form with part A of the first agreement, but it contained no counterpart of the second or concluding part, but Mrs. Dyott signed her name at the end of it under the word "Test." She signed it at about 9 o'clock on the morning of Monday, June 26th, 1933, and she died between 2 and 3 o'clock on the following morning.

On June 11th, 1934, Harriet H. Robinson Dantzebecker filed in the Circuit Court of Baltimore City an *ex parte* petition in which she set out in substance these facts, and

further stated that certain beneficiaries named in declaration No. 1 objected to the distribution of the estate under declaration No. 2, claiming that distribution should be made in accordance with the provisions of the first trust agreement. She prayed the court to assume jurisdiction of the trust estate, and to direct its distribution in "accordance with the 'Declaration of Trust' dated the 26th day of June, 1933."

Clara Lambdin, administratrix of Joseph A. Lambdin, and Charles H. Lambdin intervened in that proceeding and filed answers in which they set up these defenses: (1) That declaration No. 1 contained no power of revocation; (2) that Ruth Dyott did not direct any changes in that agreement; (3) that at the time trust agreement No. 2 was executed Ruth Dyott was mentally incapable of executing a valid deed or contract; and (4) that Harriet Robinson wrongfully without legal authority executed declaration No. 2.

After testimony and a hearing on these issues, the court decreed: (1) That agreement No. 1 did contain a power of revocation; (2) that declaration No. 2 was the free and voluntary act of Ruth S. Dyott, done when she was mentally capable of executing a valid deed or contract with her knowledge and consent and not induced by any undue influence exercised upon her; (3) that the interest of Ruth S. Dyott in the trust estate terminated at her death except as to its distribution; and (4) that distribution should be made in accordance with the provisions of declaration No. 2.

From that decree Charles H. Lambdin and Clara Lambdin, administratrix of Joseph A. Lambdin, have appealed to this court.

In natural sequence the first question presented by the appeal is whether declaration No. 1 was revocable. In part B of declaration No. 1, the settlor did three things: (1) She expressly recognized the trusts created by part A; (2) she granted the trustee power to transfer "unto her" the securities mentioned in part A; and (3) she

reserved some power of direction over the trust estate by concluding part B with the formula "until otherwise directed." That phrase follows immediately the grant of power, and the appellants contend that it qualifies and limits that power, but has no other effect, and certainly does not amount to a reservation of a power of revocation. Such a construction is possible, but it would be both illogical and unreasonable. So long as the trust continued, the power of dealing with the trust property would be necessary to its proper administration by the trustee, and there is no apparent reason why the settlor should desire to reserve the right to revoke the power unless she reserved at the same time the right to revoke the trust. And as stated in *Perry on Trusts and Trustees,* (7th Ed.) sec. 104, n. 77: "It must be observed, however, that the absence of a power to revoke a voluntary settlement or trust is viewed by courts of equity as a circumstance of suspicion, and very slight evidence of mistake, misapprehension, or misunderstanding on the part of the settlor will be laid hold of to set aside the deed. *Garnsey v. Mundy,* 24 N. J. Eq, 243, reprinted in 13 Am. Law Reg. (N. S.) 345, with a learned note by Mr. Bispham, gives a very clear view of the law applicable to voluntary settlements without a power of revocation made under circumstances which may lead to the conclusion that the settlor did not intend to put the property entirely beyond his control, or that he acted unadvisedly or improvidently. See, also, *Rhodes v. Bates,* L. R. 1 Ch. 252; *Leach v. Farr,* 13 Am. Law Reg. 350 (N. S.) ; *Villers v. Beaumont,* 1 Vern, 99; *Bridgman v. Green,* 2 Ves. 627; *Petre v. Espinasse,* 2 M. & K. 496; *Bill v. Cureton,* 2 M. & K. 511; *Hastings v. Ord,* 11 Sim. 205; *Coutts v. Acworth,* L. R. 8 Eq. 538; *Phillips v. Mullings,* L. R. 7 Ch. 244; *Hall v. Hall,* L. R. 8 Ch. 430; *Toker v. Toker,* 3 De G., J. & S. 487; *Evans v. Russell,* 31 Leg. Int. 125."

In view of the equivocal character of the language, it was proper to receive parol evidence, not to vary the instrument, but, by showing the circumstances attending

its execution and the position of the settlor at that time, to ascertain the sense in which the words were used, for, as said in *Fryer v. Patrick*, 42 Md. 51, 54: "If a written instrument is certain and definite in its contents it is the best evidence of the intention and meaning of the parties, but where it is not so it cannot be questioned that extrinsic evidence may be resorted to in aid of its terms and provisions—not to contradict it, but to explain it." *Stockham v. Stockham*, 32 Md. 196, 207; *McCreary v. McCreary*, 5 G. & J. 147, 157.

Much time, ingenuity, and labor have been expended in applying Lord Bacon's rule, that latent ambiguities may be explained by parol evidence but that patent ambiguities may not. The basis of the rule is thought to be that where the doubt does not appear on the face of the instrument the introduction of parol evidence merely completes the instrument by identifying its object or its subject-matter, while where the doubt is patent and too uncertain for settled construction, to permit its meaning to be fixed by parol evidence would be not to construe the instrument under consideration but to create a new one.

But while the inflexible and binding authority of that rule is generally recognized, there has been much confusion and some conflict as to the meaning to be given to the words "latent," "patent," and "ambiguity" in applying it to varying facts. *3 Jones on Evidence*, sec. 474. For, as was said by that author: "There are comparatively few cases in which a bare inspection of the instrument will show that no proper extrinsic evidence will afford any light on the construction of the writing. Hence the court cannot generally determine whether there is a patent ambiguity until extrinsic evidence of the surrounding circumstances has been received." *Id.*, sec. 455. And "where any doubt arises as to the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and

ascertained by evidence dehors the instrument, for both reason and common sense agree that by no other means can the language of the instrument be made to speak the real mind of the party. In such a case parol evidence is admissible *ex necessitate.*" 22 *C. J.* 1199. Again it has been said: "It is certainly not true that an ambiguity appearing on the face of the paper, if that alone is looked to, cannot be explained by parol, and the rule laid down by Lord Bacon that extrinsic evidence is not admissible to explain a patent ambiguity has never been acted upon in its widest extent, for there are to be found in the reports many cases where, although the ambiguity was such as should undoubtedly be designated as patent, if that term is taken in its broad sense, the courts have admitted evidence to explain it, or to show the circumstances surrounding the transaction and the situation of the parties." 22 *C. J.* 1197. And cases authorizing parol evidence to show to what object or subject the language of written instruments was intended to apply, that the intent of the parties may prevail, are too numerous for convenient citation, *McCreary v. McCreary, supra.* For "when a question arises as to the general intention of the parties concerning which the instrument is not decisive, it has been held that proof of independent facts, collateral to the instrument, may be properly admitted," *(Stockham v. Stockham, supra.* See, also, *Warfield v. Booth*, 33 Md. 63, 70; *Myers v. Myers*, 153 Md. 44, 48, 137 A. 501; *Kleiman v. Orion Knitting Mills*, 139 Md. 550, 115 A. 857; *Ess-Arr Knitting Mills v. Fischer*, 132 Md. 1, 8, 103 A. 91; *Phoenix Pad Mfg. Co. v. Roth*, 127 Md. 540, 544, 96 A. 762), as well as contemporaneous statements indicating the understanding of the parties as to the meaning of the equivocal words, for in such a case statements so made are facts and part of the surrounding circumstances. 22 *C. J.* 1179, 1180; *Wigmore on Evidence*, 2471, 2472; 10 R. C. L. 1076.

When resort is had to the evidence as to the circumstances attending the transaction and the situation of the

settlor at that time, any doubt as to her belief that she had reserved the power at once disappears. She was a woman of more than ordinary intelligence. At the time she instructed her lawyer as to the preparation of declaration No. 1, she was on her way to a hospital for a serious operation, she was uncertain whether she would survive it, she did not want to make a will, but she did want to arrange her affairs so that she would enjoy the use of her property while she lived, and that it would then go to the persons she wished to have it. The phrase "otherwise directed" was not in the paper as first drawn, but was added by the draftsman after the first draft was read to Mrs. Robinson, and she had said: "Now is it all worked out so that my sister can change it at any time?" There was evidence that Mrs. Dyott went to the office of her lawyer to have some instrument drawn "that would be secret * * * and still have the same right to change it as you would a codicil in a will," and she talked over with him "what right she would have or control over it if she would let this deed go to Hattie," and her instructions to the lawyer were that she was "to have the right to change it at any time that she saw fit." The only reasonable inference permissible in these circumstances is that the phrase "until otherwise directed" was intended to apply to the whole instrument, and that it reserved to her an express power of revocation.

The second question is whether she did in fact revoke declaration No. 1. She did not revoke it in express terms, but if declaration No. 2 is valid, it is so far inconsistent with declaration No. 1 as to amount to an implied revocation *pro tanto*. Declaration No. 1 was silent as to the manner of revocation, but "if the settlor reserves a power to revoke the trust but does not specify any mode of revocation, the power can be exercised in any manner which sufficiently manifests the intention of the settlor to revoke the trust." *Am. L. Inst. Restatement, Trusts*, sec. 330, p. 992. And "if the settlor reserves a power to revoke the trust but does not specify any mode of revocation, the power may be exercised by the execution and

delivery to the trustee of a new trust instrument declaring a trust different from that declared in the original trust instrument. If the settlor having such a power of revocation wishes to create a different trust, it is unnecessary formally to revoke the trust and to have the trust property reconveyed to him before creating the new trust; but he can revoke the old trust and create the new one in a single transaction." *Id.*, p. 993; 65 *C. J.* 347. There is no doubt that declaration No. 2 contains important provisions inconsistent with those contained in declaration No. 1, and to that extent, if it is valid, it revoked the earlier instrument.

The controlling question then is: Was declaration No. 2 a valid instrument? It may be observed that on its face and literally it does not purport to be the act of Ruth S. Dyott, but the act of Harriet H. Robinson. It begins with this statement: "This Declaration of Trust made by me, the undersigned, Harriet H. Robinson of St. Michaels, Talbot County, Maryland." It ends with this sentence: "In Witness Whereof I have signed my name and affixed my seal at St. Michaels, Talbot County, Maryland, this 26th day of June, 1933," and the signature and seal of Harriet H. Robinson. The fact that Mrs. Ruth S. Dyott was a party to it is nowhere stated in the instrument, and must be inferred, if at all, from the fact that she signed it under the signature of Anna J. Dyott, who signed it under the word "Test," obviously as a witness. No point was made of that circumstance, however, either in this or in the trial court, and if it clearly appears that in signing the paper Mrs. Ruth Dyott intended to adopt it as her act, her intention should not be defeated by any mere formal irregularity. The uncontradicted evidence is that the paper was intended to supersede declaration No. 1. It could have had no other possible purpose, nor was there any reason why Mrs. Ruth Dyott should have signed it except to signify that she knew its contents and adopted it as her act. The fact that her signature did not appear under that of Mrs. Robinson was immaterial. *Elli-*

*ott on Contracts,* secs. 1318, 3890; *Devlin on Deeds,* secs. 31, 31A, note 4. The instrument was drawn at her request, and in accordance with her instructions; it was she who asked Anna Dyott to sign it as a witness; before signing it she read it over, and after reading it said to her friend E. L. Holland, who had carried her instructions to the lawyer who drew it and had brought it to her: "You know what I want done, and we have gone over it all." From those undisputed facts it must be inferred that when she signed the paper she intended to signify that it was her act as well as the act of Mrs. Robinson.

But the appellants contend that, when she signed it, she was so wasted and enfeebled by disease, and so affected by drugs administered to her in the treatment of her illness, that she lacked the mental capacity to execute any valid deed or contract, and they say also that Mrs. Robinson stood in a confidential relation to Mrs. Ruth Dyott, that she received under declaration No. 2 a substantial increase over the provision for her benefit in declaration No. 1, and that for that reason declaration No. 2 is *prima facie* void.

There can be no doubt that under any possible definition of the term, Mrs. Robinson did stand in a "confidential relation" to the settlor at the time declaration No. 2 was executed. *Zimmerman v. Bitner,* 79 Md. 115, 28 A. 820; *Brown v. Mercantile Trust & Deposit Co.,* 87 Md. 377, 390, 40 A. 256; 12 C. J. 421; *Pomeroy, Eq. Jur.* sec. 956; *Kensett v. Safe Dep. & Tr. Co.,* 116 Md. 526, 82 A. 981; *Colburn v. Ellers,* 160 Md. 104, 153 A. 14; *Farmer v. O'Carroll,* 162 Md. 431, 160 A. 12, 17.

Where such a relation exists, the principle is firmly established that, while valid transactions between the parties are possible and in certain circumstances permissible, yet where the party occupying a position of dominion or superiority receives a benefit from the transaction, there is a presumption against its validity, and the beneficiary is under the burden of showing by clear and convincing evidence that there has been no abuse of the

confidence, that he has acted in good faith, and that the act by which he is benefited was the free, voluntary, and independent act of the other party to the relation, done with full knowledge of its purpose and effect. *Pomeroy, Eq. Jur.* 957; *Farmer v. O'Carroll, supra; Kensett v. Safe Dep. & Tr. Co., supra; Colburn v. Ellers, supra.* As was said in *Farmer v. O'Carroll, supra*: "To discharge this burden it must be made clear not simply that the donor, grantor, or contracting party knew the effect of his action, but that he, under no sort of undue influence, had either competent and disinterested advice, or had performed a not unreasonable act with knowledge of its nature and as the result of the free exercise of independent will. *Zimmerman v Frushour,* 108 Md. 115, 126, 69 A. 796; *Taylor v. Pivec,* 149 Md. 526, 532, 131 A. 757; *Todd v. Grove,* 33 Md. 188, 194, 195; *Inche Noriah v. Shaik Allie Bin Omar* (1929) A. C. 127, 135 (P. C.); *Bispham's Equity* (8th Ed.) sec. 237." *Brown v. Mercantile Trust Co., supra.*

In determining whether the beneficiary has met that burden, consideration must be given to the mental and physical condition of the benefactor at the time of the transaction. It therefore becomes necessary to review the evidence, which is brief and not necessarily conflicting, concerning that and all the other facts attending the transaction.

Mrs. Ruth S. Dyott was the widow of Joseph Dyott, who died about five years before the trial of this case. They lived together in St. Michaels, where they conducted a general store. Prior to her husband's death, Mrs. Dyott was found to be suffering from cancer, for which she submitted to an operation. The operation brought temporary relief, but eventually the disease returned, and later, in addition to that dreadful affliction, she suffered from some disease of the gall bladder for which, early in 1933, another operation was found to be necessary. Because of her apprehension as to the result of that operation, she decided to make some disposition of her

property, but was unwilling, if any other satisfactory method could be adopted, to dispose of it by will. In that situation she applied to E. L. Holland, a business man residing in Baltimore, for advice. Holland had been a friend of her husband and her friend. He had been in the habit of visiting at frequent intervals Maurice Dyott, her brother-in-law, with whom she was then living. She had removed to Maurice Dyott's home about a year after her husband's death, and continued to live there until her own death. Shortly after she went to live with Maurice, her sister Harriet H. Robinson Dantzebecker, referred to in the record as Harriet Robinson, came to live with her to give her such attention as she needed, and she was living with her when the transactions under consideration occurred. The other members of the household then were Maurice Dyott, his wife, Anna, and their three children.

When she consulted Mr. Holland, he suggested that she consult Mr. Eldridge Hood Young, a lawyer in Baltimore, who was his lawyer, and later Mrs. Dyott, Harriet, and Holland went to Young's office. On the visit Harriet carried a satchel in which were securities belonging to the estate. At the conference Mrs. Dyott discussed fully with Mr. Young the manner in which she wished to dispose of her property, and the nature and effect of the instrument which he suggested as a possible method of effecting her wishes, and of her desire to have the power to change the instrument at any time "she saw fit." She then went to the hospital, Mr. Young drew the paper, and when Mrs. Robinson and Holland came to the office he handed it to Mrs. Robinson to read. Before she executed it she asked Young if it was "all worked out so that her sister could change it at any time." He then added to it the words "until otherwise directed." She then executed it and it was handed to Holland, who took it to Mrs. Dyott at the hospital, and she also executed it. A summary of Mrs. Dyott's instruction was given in the following words by Mr. Young: "Mrs. Dyott instructed me to

prepare a paper or papers that would turn over to Mrs. Robinson, her sister, the different securities and property mentioned in it, so that she should have the beneficial enjoyment of it, and particularly the income during the life, and in the event of her death to go to the named beneficiaries with the right to change any of those beneficiaries any time during her life time."

In the following May, Mrs. Robinson told Mr. Young that it had been necessary to sell some of the securities of the estate, and that her sister wanted to know whether she had to authorize their sale. Young then prepared, and Mrs. Dyott signed, the letter of May 11th.

After her return from the hospital Mrs. Dyott's health grew steadily worse. Her sister Mary, for whom she had made some provision in declaration No. 1, died on the 20th of June about a week before her own death, and on the Friday preceding her death she asked Anna Dyott whether Mr. Holland was coming down on Saturday; that she wanted to talk over her affairs with him; that there needed to be some changes. Anna replied that she did not know, but later called Holland over the telephone, and he did come on the following day. He saw Mrs. Dyott Sunday, June 25th, and she had at that time a copy of declaration No. 1, and noted on it the changes she wanted made, spoke of them to Holland, and said "that she had been thinking of some changes in it any way and now that she had to make them." She gave the paper with the notations on it to Holland and said "she wanted to have it fixed," and he brought it to Young, who drew the second declaration of trust from the memorandum which Holland brought. Mrs. Anna Dyott was present when Mrs. Ruth Dyott discussed the changes and the memorandum with Holland, but it does not appear that Harriet was there; Holland said he thought she was not.

After Young had drawn the second declaration, Holland returned to St. Michaels on Monday morning, June 26th, and gave it to her. She read it and asked Holland if he thought it was all right, and he replied that as far

as he knew it was, and "eventually Hattie (Mrs. Robinson) came in and signed it," and Mrs. Ruth Dyott and Mrs. Anna Dyott signed it in the manner stated *supra*. At twenty or twenty-five minutes after two o'clock on the following morning she died.

At the time of her death she was suffering from cancer of the lungs, in the course of her illness she would have violent and exhausting coughing attacks, and her physical condition became steadily weaker as the disease progressed, although it appears that neither her physician nor the members of the household appeared to realize that the end was so near when she signed the paper on June 26th. There was no suggestion that she had any specific mental derangement at any time, and the only intimation of any want of mental capacity, except such as may have been inferred from her extreme weakness, is found in the testimony of Charles Lambdin, who saw her on June 25th, sat on her bed, and talked to her for twenty or twenty-five minutes. He said that he noticed a change in her physical and also her mental condition. There would be "momentary lapses" in her "sentences and talk," "just little lulls in her conversation," and he thought from her appearance that she was dying. He saw her again on Monday, and in the course of that visit she asked him, "When did you come down?" and when he replied: "Ruth, I came down yesterday." She said: "Oh my, I cannot get myself together this morning somehow."

Clara Lambdin, widow of Joseph, saw her on the Thursday preceding her death, and Robert Preston Lambdin, a nephew, on the following day. In so far as it is repeated in the record, her conversations with both of these witnesses were natural and coherent, without the slightest suggestion of mental weakness or derangement, and the testimony of Anna Dyott and Maurice Dyott is that there was no apparent change in her condition until just before the end; at about 2 o'clock in the morning of her death she heard Maurice moving around and asked his wife: "Is Maurice going crabbing?" He heard her and came

in, and she asked him: "You are not going crabbing this morning?" He said no and sat down by the bed, and they talked together and she was, he said, "conscious right up to the last minute and knew everything." Holland, her friend, thought that she had "more brains than all the rest of the family put together." She went out in an automobile about a week before her death.

From this evidence it cannot be said that when she executed declaration No. 2 Mrs. Ruth Dyott was not capable of executing a valid deed or contract, nor is there any tangible indication that in executing it she was influenced in any way by Mrs. Robinson, or that it represented anything but her own free and unbiased will. It does appear from the paper itself that Mrs. Robinson receives a much larger share of the estate under that declaration than under the former one, but the natural and reasonable explanation of that is Mrs. Dyott's love and affection for the sister, who served her day and night, and slept on a couch by her bed. It is true that what she gave to Harriet lessened the shares of her brothers, but the property was her own, and the law gave to her, and not to them, the right to dispose of it.

She was enfeebled by the ravages of a painful and incurable disease, but the evidence shows that it had not impaired her mind, nor weakened her will. On the contrary, it permits no reasonable conclusion other than that when she executed declaration No. 2 she was in the full possession of her mental faculties, that she had full knowledge of its purpose and effect, and that it was her free and voluntary act. Such cases as *Frush v. Green,* 86 Md. 494, 39 A. 863, where the very purpose of the instrument was so unnatural and so inconsistent with the past conduct of the grantor as to afford strong evidence of undue influence, and where the evidence of the attending physician was explicit and unequivocal that the testator was utterly incapable of executing a valid deed or contract, have no application. But the case rather falls under the rule stated in *Higgins v. Carlton,* 28 Md. 115, that "neither age nor sickness, nor extreme distress, nor debil-

ity of body, will affect the capacity to make a will if sufficent intelligence remain."

It follows that the appellee sufficiently met the burden placed upon her, and that the decree of the trial court should be affirmed.

*Decree affirmed with costs.*

PARKE, J., filed a separate opinion as follows, in which BOND, C. J., concurred.

The concurrence of the writer in the opinion filed has certain qualifications which should be noted. The original declaration of trust was executed in two parts. The second part was executed by the settlor, and was quoted in its entirety in the opinion of this court, so there is no occasion for its repetition. Aside from its formal conclusion and execution, the second part is in one sentence which, first, is an adoption of the terms of the trust previously set forth in the preceding part, and, next, a bestowal upon the trustee of enumerated powers. These powers follow one another without any separation by punctuation, but their division is indicated by the successive use of an introductory infinitive. If grammatical significance be given to the form of their expression, the powers conferred were (1) to do every act specified in the declaration of trust, and (2) to transfer unto the trustee all of the securities mentioned in the declaration of trust in the same manner as if personally done by the settlor.

These specified powers are followed by the statement that the document conferred this authority subject to the reservation that the powers granted should only continue to be exercised by the trustee "until otherwise directed" by the settlor.

The surrounding circumstances enforce this construction of a paper writing which, in the opinion of the writer, expressed an intention without ambiguity.

In accordance with the view here expressed, the writer, while concurring in other respects, does not agree with the conclusion of the court that the document was

ambiguous nor, if it were, that parol evidence of the settlor's intention, of her instructions to the draftsman, or of her conception of the instrument's effect was admissible in evidence in aid of construction. *Wigmore on Evidence* (2nd Ed.) sec. 2471, p. 408; *Furness, Withy & Co. v. Randall*, 124 Md. 101, 106, 91 A. 797; *Boswell v. Hostatter*, 129 Md. 53, 56, 98 A. 222; *Bond v. Weller*, 141 Md. 8, 12, 118 A. 142.