## HUGHES *v.* McDANIEL

[No. 160, October Term, 1952.]

*Decided July 2, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*James W. Hughes* for the appellant.

*Albert B. Mosebach*, with whom were *Brown & Mosebach* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This suit in equity was entered in the Circuit Court for Cecil County by Alice L. McDaniel to annul an agreement which she and her husband, Marshall D. McDaniel, now deceased, entered into with James W. Hughes, attorney, of Elkton, for the disposition of a trust estate.

The record shows that McDaniel, who had been a resident of New York City for many years, owned a vested remainder estate in a tract of 1,368 acres of land near North East, known as Shady Beach, under a deed of trust made by his grandfather, Delaplaine McDaniel. In 1920 McDaniel, who was an excessive drinker of alcoholic liquors, sold his remainder estate, when it was contingent, for $500. Later, realizing his mistake, he sought to get his estate back. After extended litigation, he succeeded in recovering it. In order to guard himself from making a similar mistake again, he made a deed of trust of the estate in January, 1932, to his brother, Alexander H. McDaniel, reserving the power to dispose of it by will. Within a year he became dissatisfied with the trusteeship, evidently because his brother "ruled with a tight rein." He retained Henry A. Warburton, Sr., and Hughes as his attorneys to attack the deed of trust. The Court, however, refused to annul the instrument and assumed jurisdiction of the trust.

In December, 1939, Alexander H. McDaniel, after more than seven years of dissension, resigned as trustee;

and on January 17, 1940, the Court appointed Hughes and Albert L. Constable as substituted trustees.

It now became increasingly evident that the income from the trust estate was not enough for McDaniel, who had moved from New York City to Shady Beach in 1937. He had been unemployed for many years and he had no income other than that from Shady Beach. Accordingly he sought to borrow money with which to build some houses on the tract to supplement his income.

Complainant testified that on February 8, 1940, she and her husband, after receiving word of the death of a friend in New York, called to see Hughes to ask him for a loan of ten dollars with which to buy some flowers for the deceased. She recalled that Hughes agreed to advance them $700 and that he produced some papers for their signatures. She swore that the papers were not read or explained to them. She testified: "We were both in a hurry to get to the florists to be able to send the flowers in time before the woman was buried, * * * and we went to Wilmington and ordered from that place." She also testified that they signed the papers, left them in Hughes' possession, and received the check for $700.

McDaniel died on April 28, 1952. About two weeks later Hughes notified Mrs. McDaniel that he had her husband's will naming her as the executrix of his estate. He urged her to probate the will in the Orphans' Court of Cecil County and to qualify as executrix. Mrs. McDaniel testified that she was surprised to learn that her husband had made a will on February 8, 1940, in accordance with an agreement with Hughes on that day. She testified that she asked Hughes to show her the agreement and that he took it out of his safe and showed it to her. The will gave the *corpus* of the trust estate to her for life, and after her death to Hughes absolutely.

The agreement, which was executed in Hughes' law office on February 8, 1940, contains the following provisions:

"1. The said James W. Hughes agrees to furnish to or procure for the said Marshall D. McDaniel and Alice L. McDaniel such funds as shall be agreed upon between the parties hereto ($700.00 as of the date of the execution hereof).

"2. The said Marshall D. McDaniel agrees that he will execute a last Will and Testament by which he shall leave to the said James W. Hughes, absolutely the *corpus* of the aforesaid Trust Estate from and after the death of the said Alice L. McDaniel.

"It is understood and agreed between the parties hereto that the *corpus* of said Trust Estate shall be left by the said Marshall D. McDaniel to his wife, Alice L. McDaniel, for and during her life, if she be living at the time of his death, and that following the death of the said Alice L. McDaniel, the devise or bequest to the said James W. Hughes shall be subject to the payment of the sum of $2500.00 to Henry A. Warburton, Sr., which obligation is now evidenced by a note to the said Henry A. Warburton, Sr., made by the parties of the first part."

Hughes testified that when the McDaniels came to his office on February 8, 1940, he handed each of them a copy of the agreement. He asserted that they read it, discussed it, fully understood it, and were satisfied with it. He further testified: "Since all parties were satisfied that the agreement did cover accurately exactly what we had agreed upon in our previous discussions, the agreement was signed in triplicate and the will was executed. Mrs. McDaniel was given one of the executed copies of the agreement. They did not wish to take two with them. The other executed copies, one went into the McDaniel file in my files and the other went in my personal papers."

Hughes claimed that he loaned the McDaniels $3,397.01 between February 8, 1940, and December 31, 1948, and $1,485 between April 29, 1949, and March 16, 1951, making a total loan of $4,882.01.

But the chancellor observed that if Mr. and Mrs. McDaniel had both died shortly after the execution of the agreement, Hughes would have acquired property worth $32,500 for $700; whereas if Mrs. McDaniel should die now, Hughes would come into possession of property worth $87,000 in consideration of a loan of about $4,800. The chancellor accordingly entered a decree annulling the agreement and referring the case to an auditor to state an account determining the amount of money advanced by Hughes to the McDaniels, such amount to be a lien on the real estate. Hughes appealed here from that decree.

It is an elementary principle of law that in the execution of a trust the trustee is bound to comply strictly with the directions contained in the instrument defining the extent of his authority and the nature of his powers and duties. Moreover, a trustee is prohibited from placing himself in any position where his self-interest will or may conflict with his duties as trustee, or from using the advantage of his position to gain any benefit for himself at the expense of the beneficiary of the trust. It is accordingly an accepted rule in equity that the presumption is against the validity of any purchase by a trustee from the beneficiary or any other transaction with the beneficiary which might result in a benefit to the trustee. *Pairo v. Vickery,* 37 Md. 467, 485; *Cleveland Clinic Foundation v. Humphrys,* 6 Cir., 97 F. 2d 849, 121 A. L. R. 163, 172; *Magruder v. Drury,* 235 U. S. 106, 35 S. Ct. 77, 82, 59 L. Ed. 151.

Of course, it is possible for the trustee to overcome the presumption of invalidity. The transaction will be sustained by a court of equity if the trustee shows by convincing evidence that the beneficiary had full information and complete understanding of all the facts concerning the property and the transaction and gave

free consent, and that the amount paid was fair and adequate, and that he made the beneficiary a perfectly honest and complete disclosure of all the information which he had concerning the property, and that he has obtained no undue or inequitable advantage, and especially, but not necessarily, if it appears that the beneficiary acted in the transaction upon independent information and advice of some intelligent third person competent to give such advice. *Lambdin v. Dantzebecker,* 169 Md. 240, 250, 251, 181 A. 353, 102 A. L. R. 277; *Hagan v. Dundore,* 187 Md. 430, 440.

Transactions for the personal advantage of a trustee who is also acting as the attorney for the beneficiaries, who are inexperienced in the law, are even more improper than similar dealings between laymen. The reason why the doctrine is enforced with the utmost stringency when the trustee is also acting as the attorney is that such transactions are presumably made under the influence, if not the pressure, of legal advice. To sustain such a transaction the trustee must show that there was a full and complete disclosure on his part of all the facts essential to an intelligent understanding by the beneficiaries of the subject matter and the consequences of the transaction. *Will of Leonard,* 202 Wis. 117, 230 N. W. 715, 83 A. L. R. 712; 3 Pomeroy, *Equity Jurisprudence,* 5th Ed., sec. 958d.

In fact, any challenged transaction between an attorney and client is *prima facie* fraudulent and void, and the burden is cast upon the attorney to show that he used no undue influence or deception, that the transaction was fully understood, and that it was fair in all respects. This rule is founded upon public policy, because the confidential and fiduciary relationship enables an attorney to exercise a very strong influence over his client and often affords him opportunities to obtain undue advantage by availing himself of the client's necessities, credulity and liberality. As we said in *Baker v. Otto,* 180 Md. 53, 22 A. 2d 924, courts of equity look upon transactions between attorney and client with great

solicitude, and exercise the most exact scrutiny to be certain that the attorney has not taken any unfair advantage of his client. When a transaction between attorney and client is attacked, the presumption of fraud or unfairness can be overcome only by the clearest and most satisfactory evidence. Where the attorney is in a position to exercise strong influence, and the client is not skilled in business and is easily influenced, the burden on the attorney to sustain the transaction with his client is extremely stringent.

In the instant case it is evident that the clients reposed implicit confidence and trust in their attorney and trustee. It was only three weeks after Hughes was appointed trustee by the Court that he entered into the agreement now under attack. At that time the clients were in great need of cash. The record indicates that McDaniel was a heavy drinker and a poor business man and for many years had been out of employment. As we have seen, he once sold his remainder estate, when it was contingent, for $500, but he recovered it after a number of years of litigation. In January, 1932, he appointed his brother as his trustee. The deed of trust provided that upon the death of McDaniel the trust shall terminate and the trustee shall deliver the *corpus* to such persons as McDaniel may by will appoint; and in default of such appointment the trustee shall deliver the *corpus* to the parties entitled to it under the laws of intestacy. Following McDaniel's dissension with his brother, the Court appointed Constable and Hughes as his trustees. Then, after Constable's death, the management of the estate fell entirely into the hands of Hughes. Unquestionably Hughes, as attorney and trustee, should not have used the advantage of his position to gain benefit for himself at the expense of his clients.

One of the significant features of the agreement is that Hughes did not obligate himself to advance any specific amount of money. Moreover, if the real estate is now worth approximately $87,000, as the chancellor stated, and if Hughes advanced only $4,882.01, it can

certainly be said that he gained benefit from the agreement. It further appeared that of the sum advanced by him, about $2,000 was expended in making apartments in the dwelling, and about $1,500 was expended in building the bungalow on the property. Thus, while the rent from the apartments and the bungalow relieved the McDaniels' financial stress, yet these improvements, if the agreement and the will were not annulled, would eventually be for the benefit of Hughes. Consequently Hughes failed to show by clear and satisfactory evidence that he obtained no benefit from the agreement. Therefore the annulment of the agreement was proper.

Furthermore, it is obvious that when parties enter into a contract by which one of them agrees to execute a will in favor of the other for sufficient consideration, and thus the parties bind themselves by reciprocal obligations, the will made in pursuance of the contract is an integral part of the contract. *Wilks v. Burns,* 60 Md. 64, 70; *White v. Winchester,* 124 Md. 518, 523, 92 A. 1057; *Scott v. Marden,* 153 Md. 1, 12, 137 A. 518. Consequently, as we have found that the agreement for the execution of the will is void, and as the agreement and the will constituted a single contract, it necessarily follows that the Court must also declare the will void. *In re Carroll's Will,* 274 N. Y. 288, 8 N. E. 2d 864, 868, 115 A. L. R. 923, 928; *Pitman v. Pitman,* 314 Mass. 465, 50 N. E. 2d 69. In view of this decision it is unnecessary to consider whether the rules stated in *O'Hara v. O'Hara,* 185 Md. 321, are applicable in this case.

We will, therefore, affirm the annulment of the agreement and remand the case to the Court below for the passage of an amended decree declaring both the agreement and the will void.

> *Decree affirmed in part, and case remanded for the passage of an amended decree in conformance with this opinion, the costs to be paid by appellant.*