## McDANIEL, Executrix v. HUGHES, Individually and as Trustee

[No. 67, October Term, 1954.]

208

*Decided January 20, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Albert B. Mosebach* for the appellant.

Submitted on brief by *James W. Hughes* for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Cecil County overruling the exceptions of Alice L. McDaniel, appellant, to an account filed by James W. Hughes, as trustee.

For a proper understanding of this case, it is necessary that the facts be recited in detail. In 1920 Marshall D. McDaniel, now deceased, who was an excessive drinker of alcoholic liquors, sold his remainder interest, then contingent, in a tract of land known as Shady Beach, consisting of 1,368 acres near North East in Cecil County, Maryland, for $500.00. He later sought to get back his estate. After extended litigation he succeeded in doing this. In order not to make a similar mistake, in January, 1932, he made a deed of trust of this estate, including that part known as the Cameron Farm consisting of 125 acres, more or less, to his brother, Alexander H. McDaniel, of Wilmington, Delaware, reserving unto himself the power to dispose of it by will. Within

a year he became dissatisfied with the trusteeship because he thought his brother "ruled with a tight rein". He then retained Henry A. Warburton and James W. Hughes as his attorneys to attack this deed of trust. The court, however, refused to annul the deed and assumed jurisdiction of the trust. The facts hereinbefore recited are set out in the case of *Hughes v. McDaniel*, 202 Md. 626, 98 A. 2d 1, which involved the parties here.

On May 23, 1939, Alexander H. McDaniel, the trustee, received an offer of $8,400.00 for the Cameron Farm from the Arundel Corporation and on July 12, 1939, he received offer of 8,640.00 from John J. Monaghan Company, realtors, of Wilmington, Delaware. On July 26, 1939, he filed a petition through Albert Constable, solicitor, in which he stated that there were no assets in his hands and that he had been obliged to advance from his own funds money for the support of the *cestui que* trust. He also recited the aforesaid offer from Monaghan and asked authority of the court to make the sale. Attached to that petition was an affidavit from three real estate men in Cecil County stating that in their opinion this tract of land was worth $6,000.00. A show cause order was signed by the chancellor and a copy served on Marshall D. McDaniel and Alice L. McDaniel, his wife. Marshall and Alice answered this petition through Henry A. Warburton and James W. Hughes, solicitors, reciting, among other things, that the offer set forth in the petition was in fact the offer of Alexander H. McDaniel and that as trustee he should not be authorized or permitted to sell any part of the trust estate to himself. As a result of that answer the chancellor refused to order the sale.

On October 23, 1939, Marshall and Alice, by Henry A. Warburton and James W. Hughes, solocitors, filed a petition reciting that they had received from Albert E. Fletcher a *bona fide* and definite offer of $10,000.00 for the Cameron Farm; that it would be to the benefit and advantage of said trust estate to accept said offer, as there was a mortgage on the tract, of which the Cameron

Farm was a part, of $7,500.00 and from the proceeds of said sale that mortgage would be paid and the trust estate would be saved interest thereon at six per cent per annum. On November 13, 1939, Alexander, as trustee, by Albert Constable, solicitor, filed a petition reciting that under directions of the court he had advertised the 125 acres and had received an offer from Fletcher of $10,000.00 and recommended to the court the acceptance of said offer. On December 18, 1939, the chancellor ordered that the offer of Fletcher be accepted and instructed the trustee to report the sale subject to ratification by the court.

On January 17, 1940, an order was signed by the chancellor reciting that Alexander McDaniel had asked leave to retire and resign the trust. The chancellor ordered that Alexander be released and discharged and he appointed James W. Hughes and Albert Constable as trustees, in the place and stead of Alexander "to perform the trust reposed in said retiring Trustee under the Deed of Trust aforementioned insofar as they have not yet been performed by the retiring Trustee." On January 19, 1940, Hughes and Constable, as trustees, filed a report that they had accepted the offer of $10,-000.00 by Fletcher for the Cameron Farm and had received $1,500.00 as part of the purchase price. This sale was ratified by the court, after *order nisi,* on April 10, 1940. On July 21, 1941, Hughes and Constable, as trustees, filed a petition in which they set out the ratification of the sale to Fletcher, that Fletcher had not paid the balance of $8,500.00 due, and that they had advised Fletcher that it would be necessary for him to comply with the terms of sale not later than July 1, 1941, but he had not so complied. They asked the court to pass an order "in the premises as may be meet and just." A show cause order was passed on that petition ordering Fletcher to show cause on or before August 15, 1941, "why the sale mentioned in said petition and ratified on April 10, 1940, should not be set aside upon such terms as this court may prescribe."

On August 27, 1952, Hughes, as surviving trustee, filed his trustee's report which covered the period up until the death of Marshall D. McDaniel, which had occurred on April 28, 1952. On October 30, 1952, Alice L. McDaniel, administratrix *pendent lite* [later appointed executrix] of the Estate of Marshall Delaplaine McDaniel, through Brown and Mosebach, her solicitors, filed an exception to the trust account of Hughes in which she set out the following facts. On October 9, 1941, the Charter of the Cecil Land Corporation was filed in Cecil County wherein the incorporators were Albert E. Fletcher, Walter E. Cooling, and Caroline McSpadden, a stenographer then employed by Hughes; the resident agent was the trustee, Hughes, and the directors were Albert Fletcher, Walter E. Cooling, Ermon W. Taylor, Dr. Wallace Johnson, Argus F. Robinson, and Hughes. On October 20, 1941, Hughes and Constable, as trustees, conveyed the Cameron Farm to Albert E. Fletcher for the consideration of $10,000.00. On the same day as the transfer to Fletcher, he and his wife conveyed the said Cameron Farm to the Cecil Land Corporation for $10,000.00. On the same date the Cecil Land Corporation mortgaged the said real estate to the First National Bank of North East for $4,000.00. As a consideration of said mortgage it was agreed between the parties thereto that, in the event of a sale of any portion of the property so mortgaged or of the sale of any sand and gravel therefrom, fifty per cent of the funds thereby derived would be applied to the principal of said mortgage. Hughes, although a co-trustee of the estate of Marshall D. McDaniel, was a resident agent of the Cecil Land Corporation, a member of the board of directors of said corporation, and was attorney for the First National Bank of North East and so named in said mortgage. It was Hughes' purpose in selling the said real estate to himself and a group of accociates as the Cecil Land Corporation, that that corporation would exploit said property for the sale of real estate, sand and gravel rights to their own profit, "to the loss of the

said estate in derogation of his duties as trustee, to act as a faithful steward, to preserve and enhance the value of the said estate and to the exclusion of his private profit; that the misconduct of the said James W. Hughes constituted a fraud in law upon the said estate." On April 21, 1942, the Cecil Land Corporation transferred the said real estate to Albert Fletcher, Argus Robinson and Hughes, as trustees for themselves and for the other stockholders of the Cecil Land Corporation for the sale of timber, sand, or gravel and for the purpose of paying over the net profits to the owners thereof ".Albert E. Fletcher, one-sixth; Walter E. Cooling and Hilda T. Cooling, one-sixth; Ermon W. Taylor, one-sixth; Argus F. Robinson, one-sixth; James W. Hughes, one-sixth; Wallace Johnson, one-sixth." That the above mentioned individuals received from the Arundel Corporation large sums of money for sand and gravel sold from the aforesaid property and that no part of the amount paid to Hughes came into the possession of the trust estate. The three trustees later sold other properties for large sums of money but none of the money received by Hughes had been paid into the trust estate. She asked that Hughes, individually, as trustee for the estate of Marshall D. McDaniel, as a stockholder of the Cecil Land Corporation, and as trustee for the stockholders thereof, be made to account for all sums of money received by him individually or in his representative capacity from the sale of the said Cameron Farm. The amount claimed from Hughes for the trust estate is approximately $11,-024.97. After answer filed and testimony taken, the chancellor on July 1, 1954, overruled the exceptions to the trust account. From that order the appellant appeals.

The testimony shows that on October 9, 1941, the certificate of incorporation of the Cecil Land Corporation was approved by the State Tax Commission. On October 20, 1941, Constable and Hughes, as trustees, conveyed the Cameron Farm to Fletcher. On the same day Fletcher and wife executed a deed of this farm to

the Cecil Land Corporation and on the same date that corporation executed a mortgage to the First National Bank of North East for $4,000.00. On April 21, 1942, the Cecil Land Corporation conveyed the Cameron Farm to Fletcher, Argus F. Robinson, and Hughes as trustees for the six stockholders as hereinbefore set out. This deed was eveidently made for tax purposes. Also offered in evidence were letters showing that Hughes from May 1, 1942, to March 11, 1947, was negotiating with the Arundel Corporation concerning the sale of gravel from the Cameron Farm.

Alexander McDaniel, called as a witness by the appellant, testified that while he was trustee he had negotiations with the Arundel Corporation which had paid the sum of $22,000.00 to the life tenants and to him as trustee for gravel dug from the farm. Arundel stopped digging in 1935 or 1936, several years before Alexander resigned as trustee.

John A. Engar, called as a witness by the appellant, testified that he was a superintendent of floating equipment of the sand and gravel department of the Arundel Corporation. He also testified that his company paid Fletcher, Robinson and Hughes, trustees, between April 30, 1942, and May 31, 1948, $55,149.85 for sand and gravel.

Walter F. Cooling, produced as a witness by the appellee, testified that in 1941 both he and Fletcher were employed by the Conowingo Power Company. Fletcher told him of the proposed purchase of the Cameron Farm and offered him a half interest if he would raise the sum of $8,500.00. Cooling was unable to get this money and Fletcher tried elsewhere. Fletcher approached Cooling again and told him he had a certain time in which to make settlement. Ermon Taylor, the father-in-law of Cooling, Argus Robinson, and Dr. Wallace Johnson, were approached about the property. Fletcher then called a meeting where financial arrangements were made for the formation of the Cecil Land Corporation. Cooling said he put $1,400.00 in it and received a one-

sixth interest. Fletcher contributed his down payment of $1,500.00. Cooling was made secretary of the corporation. Fletcher had told him that he though they could sell water front lots, and that he, Fletcher, had knowledge of sand and gravel deposits around North East and he was also considering a dry land operation. At the actual forming of the corporation he, Fletcher, Robinson, and Hughes were present. Fletcher did most of the "ground work." He said it took four or five months to form the corporation.

Argus F. Robinson, at the time of the hearing in this case, was president of the Peoples Bank of Elkton. He testified that early in 1941, when he was cashier of the bank, Fletcher approached him with the idea of participating in the purchase of the Cameron Farm and wanted help in financing. He was told that Fletcher had made a deposit on the property and needed money to complete the purchase because a man in New York, who was to finance the deal, had died. Five people were interested as a group in the purchase and Fletcher suggested that Hughes buy the remaining interest and Hughes was retained by this group to form the corporation. At the beginning of the transaction there was no idea that Hughes would participate. Each of the six participants paid $1,000.00 for the stock and advanced the corporation $400.00. He said at a subsequent date in 1949 a portion of the property was sold to John J. Prial and others. Mr. Mosebach, the present attorney for the appellant, represented Prial at that time. Mr. Mosebach made an objection to the title. The matter was discussed with Marshall and Alice McDaniel in the presence of the notary, Fletcher and himself, and the McDaniels executed a quit claim deed of the farm. The McDaniels seemed very willing to do this. The consideration of the deed was $1.00 which was not paid, but later the trustees paid the McDaniels $100.00 as a gift. The transaction with the McDaniels was not hurried in any respect. They chatted a few minutes before actually signing the quit claim deed. The profits from

the corporation were divided among the six share holders.

James W. Hughes, testifying as a witness for the appellant and in his own behalf, told of the difficulty in getting Fletcher to complete the purchase of the farm for $10,-000.00. He said that in September or October of 1941 Fletcher and Robinson told him an attempt was being made to organize a local company to purchase the property. He was invited to become a stockholder to the extent of a one-sixth interest, five-sixths of the stock of the corporation having already been subscribed. Robinson was of the opinion that the farm could be divided and sold as water front lots. He testified that he was employed to prepare the charter of the Cecil Land Corporation while he was co-trustee of the McDaniel estate and that he contributed $1,400.00 to the corporation. He said he knew when he prepared the articles of incorporation that Fletcher intended to convey to the corporation. Several months after the corporation purchased the property it was decided to open negotiations with the Arundel Corporation. Prior to that time he had had no contact with Arundel. As a stockholder of the Cecil Land Corporation, he shared in the monies received from Arundel. He further testified that the McDaniels were in constant communication with him and Albert Constable, the other trustee, and were fully informed of all that was taking place. They were aware of and entirely agreeable to the transaction when made and made no objection whatever to it. The sale to Fletcher was made "on the rather strong urging" of Marshall and Alice. This sale was entirely *bona fide*. No one else had any interest in it at that time. He did not have any interest in the transaction as a purchaser of any interest until the group considering the incorporation had decided to carry out the program, and asked him to prepare the papers for them and finally asked him to purchase the remaining one-sixth interest in that corporation. He did not participate in any way in the financing previous to that time. This was more than a year after the sale had

been ratified by the court. While the negotiations were in progress for the sale of the farm to Fletcher, Marshall and Alice talked to him about the matter and expressed their pleasure that an arrangement was being made whereby Fletcher would not lose his deposit on the property. At that time they were fully informed of Hughes' participation in the corporation. When the sale of part of the property was made to Prial in 1949, Marshall and Alice first advised him as to the objection to the title. They came to his office and told him that they had been requested to go to Mr. Mosebach's office. Mosebach told them that he was objecting to the title and set forth the various objections which were repeated in the exceptions here. Mosebach told them that the sale was invalid because he, Hughes, had participated in the corporation which purchased the farm from Fletcher. He said they told him that Mosebach had solicited them to permit him to file a suit to recover from him, Hughes. Mosebach did not testify in the case. The McDaniels had also discussed the matter with Fletcher. Shortly after that conversation Fletcher recited to Hughes the objections of Mosebach, which he had learned from the McDaniels. Soon thereafter he was requested to prepare a quit claim deed by Fletcher and Robinson. He prepared the deed and turned it over to them. It was later excuted and recorded. This deed under seal was offered in evidence and was executed by Marshall and Alice McDaniel on May 18, 1949, and did "remise, release and quit claim unto the said Albert E. Fletcher, Argus F. Robinson, James W. Hughes, as trustees and individually," and all persons claiming under them, the Cameron Farm. Hughes stated that the whole transaction was fully known to the McDaniels. They acquiesced in it entirely, were favorably disposed toward it, and, having full knowledge of the entire situation, finally executed the quit claim deed. He admitted that he prepared the deed from Fletcher to the corporation and the deed from the corporation to the trustees. When asked why he consulted the McDaniels so often for ratification of what

he was doing, he answered: "It wasn't necessary but it was only the reasonable and sensible thing to do. They had a very considerable interest there and I tried in every way possible to carry out their wishes in connection with the administration of the trust." He further testified that before the sale to Fletcher, with the exception of very minor rental from the farm, the trust estate produced no income. He testified that after the Cecil Land Corporation was formed, as one of the directors he started negotiations with Arundel. At the time of the formation of the corporation he had not discussed the sand and gravel business with anyone. He said it was Fletcher's purpose, very definitely, to sell sand and gravel as a land operation, but he, Hughes, had had no contact with Arundel Corporation. When asked the question, if at the time he invested in the corporation he felt that a profit could be obtained on the handling of the trust, over and above the $10,000.00 that Fletcher had offered, why he did not declare the $1,500.00 forfeited and proceed to go in business for himself, as trustee, he replied that he had no right to do so. "The property at that time was not trust property. It had been purchased by Mr. Fletcher. The sale had been ratified and equitable title had vested in him. He, upon payment of the balance of the purchase price, had the right to that property. He made arrangements by which he could get that and he exercised that right. There was a petition before the Court on which it would have been possible to make a sale at his risk, but the Court did not elect to insist upon that being done upon being advised that Mr. Fletcher had made arrangements to make the payment of the balance of the purchase price." He purchased his interest in the corporation after all the arrangements had been made. He further said that Fletcher communicated his difficulty in financing to Albert Constable, himself, and the McDaniels, and the matter was frequently discussed with the McDaniels. They desired and constantly expressed the desire to go along as far as possible with Fletcher to avoid subjecting

him to loss if the property were sold at his risk. Hughes' testimony is not contradicted in any way.

Albert E. Fletcher, being in Wilmington, Delaware, would not come to Cecil County to testify. His deposition was taken in Wilmington. In the deposition he said he made the offer of $10,000.00 for the property and the deposit of $1,500.00, intending to purchase the property for himself. The party in New York, who was to finance him, died. No one in Maryland knew anything about it until he received a letter from Hughes stating that the court had waited a year and he had to decide definitely about the property. He then started to talk to people in Maryland about it, first with Walter Cooling. He then tried to get a loan at the Peoples Bank from Argus Robinson and was turned down. He finally negotiated with Cooling and Robinson personally for the sale of the property to the Cecil Land Corporation. He said at the time the show cause order was served on him he received a call from Alexander McDaniel and was advised that Alexander could finance the deal for him. He refused Alexander's offer because Alice McDaniel did not want anything to do with Alexander. He said that he, Robinson and Cooling considered forming the corporation for the purchase of the land. After that time he contacted Hughes about forming the corporation, which was the last resort. He had wanted it for himself but "it didn't work out." Hughes was the last one to take an interest in the corporation. He further testified that Alice had told him there was gravel around the farm but that no one knew how much. Before he obtained the deed, but after the sale was ratified by the court, there had been negotiations with Arundel. Alice McDaniel had told him about the Arundel Corporation and about its offer of $7,500.00 for the farm. He further testified that he was present with Robinson and the notary when the quit claim deed was executed. The McDaniels seemed very willing to sign it. No persuasion was necessary. He mentioned at one time to Hughes that "it would be nice if we could put them down for a

part," but nothing came of that.

A trustee is not permitted to place himself in such a position that the interest of the beneficiary and his own personal interest do or may conflict and the question of whether or not such a position has resulted in a benefit or loss to the beneficiary is not permitted to be inquired into. *Mangels v. Tippett*, 167 Md. 290, 173 A. 191. The law applicable to this case is stated in the former case between the parties hereto, 202 Md. 626, *supra*, where it is said: "It is an elementary principle of law that in the execution of a trust the trustee is bound to comply strictly with the directions contained in the instrument defining the extent of his authority and the nature of his powers and duties. Moreover, a trustee is prohibited from placing himself in any position where his self-interest will or may conflict with his duties as trustee, or from using the advantage of his position to gain any benefit for himself at the expense of the beneficiary of the trust. It is accordingly an accepted rule in equity that the presumption is against the validity of any purchase by a trustee from the beneficiary or any other transaction with the beneficiary which might result in a benefit to the trustee. *Pairo v. Vickery*, 37 Md. 467, 485; *Cleveland Clinic Foundation v. Humphrys*, 6 Cir., 97 F. 2d 849, 121 A. L. R. 163, 172; *Magruder v. Drury*, 235 U. S. 106, 35 S. Ct. 77, 82, 59 L. Ed. 151. Of course, it is possible for the trustee to overcome the presumption of invalidity. The transaction will be sustained by a court of equity if the trustee shows by convincing evidence that the beneficiary had full information and complete understanding of all the facts concerning the property and the transaction and gave free consent, and that the amount paid was fair and adequate, and that he made the beneficiary a perfectly honest and complete disclosure of all the information which he had concerning the property, and that he has obtained no undue or inequitable advantage, and especially, but not necessarily, if it appears that the beneficiary acted in the tranaction upon independent information and advice of some intel-

ligent third person competent to give such advice. *Lamb-din v. Dantzebecker,* 169 Md. 240, 250, 251, 181 A. 353, 102 A. L. R. 277; *Hagan v. Dundore,* 187 Md. 430, 440, 50 A. 2d 570. Transactions for the personal advantage of a trustee who is also acting as the attorney for the beneficiaries, who are inexperienced in the law, are even more improper than similar dealings between laymen. The reason why the doctrine is enforced with the utmost stringency when the trustee is also acting as the attorney is that such transactions are presumably made under the influence, if not the pressure, of legal advice. To sustain such a tranaction the trustee must show that there was a full and complete disclosure on his part of all the facts essential to an intelligent understanding by the beneficiaries of the subject matter and the consequences of the transaction. *Will of Leonard,* 202 Wis. 117, 230 N. W. 715, 83 A. L. R. 712; 3 Pomeroy, *Equity Jurisprudence,* 5th Ed., sec. 958d." See also *Scott on Trusts,* Vol. 2, Sec. 170.1.

As to this rule, it was said by Judge Parke in the Case of *Harlan v. Lee,* 174 Md. 579, 199 A. 862: "* * * * the rule is not applicable if the purchase be made to protect the interests of the *cestuis que trustent; (Spindler v. Atkinson,* 3 Md. 409, 423, 424), or with the agreement of the *cestuis que trustent,* if these be fully advised of their interest and rights and have adequate knowledge or information of the relevant and material circumstances of the matter (*Schockett v. Tublin,* 170 Md. 117, 126-127, 183 A. 521; 3 *Bogert on Trusts and Trustees,* sec. 484, p. 1521) or if the *cestuis que trustent* be barred from their right to avoid the sale by subsequent ratification, acquiescence, or laches *(Mason v. Martin,* 4 Md. 124, 134-137; *Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co.,* 16 Md. 456, 508; *Read v. Reynolds,* 100 Md. 284, 292, 293, 59 A. 669; *Love v. Rogers,* 118 Md. 525, 532, 533, 85 A. 771; *Whitelock v. Dorsey,* 121 Md. 497, 502, 88 A. 241; *Hammond v. Hopkins,* 143 U. S. 224, 12 S. Ct. 418, 36 L. Ed. 134), or if the fiduciary be authorized by staute, by instrument creating the trust, or

by the court having jurisdiction of the subject matter, provided the sale be fairly made. 3 *Bogert on Trusts and Trustees,* sec. 484, pp. 1521, 1522; * * *"

Under all the evidence here the appellant and her husband were the motivating forces in casuing the farm here in question to be sold to Albert Fletcher. At that time the trust estate was without productive assets and, as stated by the appellant and her husband in their petition to sell the farm, there was a mortgage on the property, of which this farm was a part, in the amount of $7,500.00. Alexander McDaniel was obliged to advance his own money for the support of appellant and her husband. As stated by the chancellor in his opinion, this money was needed to pay off an over-due mortgage. Before the resignation of Alexander McDaniel as trustee, he filed the petition which stated that said offer from Fletcher was received after an advertisement of the 125 acres. The then chancellor ordered that the offer of Fletcher be accepted. Fletcher, after interviewing and negotiating with many people, had been able to raise all except one-sixth of the balance of the purchase price. Hughes was then solicited and until that time he had no intention of being in any way concerned with the purchase. Hughes so testified without contradiction and he is substantiated by Robinson and Fletcher. It is very porbable that, if Hughes as the last subscriber had not put up the $1,400.00, someone else would have done so. The appellant contends that Hughes should have forfeited the sale to Fletcher and operated a gravel business for the trust. As pointed out by the chancellor, the war began shortly after the conveyance to the corporation. The large profits which were made were "hindsight". After having been ratified by the court, this sale could not be forfeited unless Fletcher failed to pay the purchase money, which he apparently would have been able to do regardless of the contribution made by Hughes. There appears to be no conflict here between the position of the beneficiaries of the trust and Hughes. Hughes merely assisted in carrying out the

desires of the *cestuis que trustent*. The appellant relies strongly on the case of *Hoffman Coal Co. v. Cumberland Coal & Iron Co.*, 16 Md. 456. In that case a director in a corporation, at the time the sale of the property was made, actively participated in all the measures tending to its completion and had full knowledge of all the circumstances in connection with it. Here, Hughes had no knowledge of the contemplated conveyance to the corporation at a time when the sale to Fletcher was ratified. It is said in *Bogert on Trusts and Trustees,* Vol. 3, Part 1, pages 104 and 105; "It is common for a trustee to seek to avoid the rule by having a third party purchase and then getting a conveyance from him at a later date. This device is an indirect violation of the spirit of the rule and will not be countenanced. If the third party appears to have been used as a dummy or straw man, the *cestui* will have the same rights as if the sale had been direct to the trustee. [*Turk v. Grossman,* 176 Md. 644, 6 A. 2d 639.] But, if the third party was an independent *bona fide* purchaser, the trustee who sold to him may later buy from him without liability to attack by the *cestui."* *Stever v. Hall,* 95 N. J. Eq. 169, 122 A. 441. Moreover, a transaction by a trustee affecting a beneficiary will be sustained if the trustee shows by convincing evidence that the beneficiary had full information and complete understanding of all the facts and gave his free consent. Hughes testified that the McDaniels were consulted throughout the transaction and knew that he was a stockholder in the corporation which purchased from Fletcher. Alice McDaniel, who is the appellant in this case, did not testify in this case and did not contradict any of Hughes' testimony. In fact, Hughes' testimony stands uncontradicted. Nor did she allege in the exceptions to the account that she was ever ignorant of the fact that Hughes was a stockholder in the corporation. She did testify in the former case, 202 Md. 626, *supra.*

Furthermore, the appellant here does not seek to avoid the sale. In fact, she and her husband both ratified it.

In 1949, over seven years after the farm was deeded to the corporation in which Hughes had an interest, and ater her attorney here made objection to the title on the very grounds upon which this case rests, she and her husband signed the quit claim deed. Argus Robinson testified that they seemed very willing to do this. Hughes said they had previously been informed of all details of the transaction. Fletcher testified that he was present with Robinson when the quit claim deed was executed, that no persuasion was necessary, and the McDaniels seemed very willing to sign. No claim is made here by the appellant that this quit claim deed was executed under duress, that fraud was practiced upon the McDaniels at the time it was signed, or that they were not familiar with all the transactions in this case. *Forbes v. Forbes,* 5 Gill 29; *Hammond v. Hopkins,* 143 U. S. 224, 12 S. Ct. 418, 36 L. Ed. 134; *Kahn v. Chapin,* 152 N. Y. 305, 46 N. E. 489; *Baldwin v. Drew,* Texas, 180 S. W. 614. We are of opinion that the chancellor was correct in overruling the exceptions to the trustee's account.

*Order affirmed, with costs.*