**HYDE PARK CLOTHES, Inc. v.
UNITED STATES.**

**No. 48526.**

United States Court of Claims.
July 11, 1949.

Edwin J. McDermott, Philadelphia, Pa., for plaintiff.

William A. Stern, II, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This claim involves the sum of $12,354.-03, which amount represents a charge made against plaintiff for 2,112⅛ yards of cloth, an excess of allowance provided in plaintiff's contract for the manufacture of uniforms for defendant.

On July 23, 1942, the Philadelphia Quartermaster Depot issued requests for informal bids. The bid form (Sheet No. 2) which was furnished plaintiff contained these capitalized, underlined words:

CLOTH FURNISHED BY THE GOVERNMENT TO BE USED IN THE MANUFACTURE OF THESE GARMENTS WILL BE UNSHRUNK. CONTRACTORS MUST HAVE CLOTH SHRUNK AND REFINISHED BEFORE MANUFACTURING THE GARMENTS.

Sheet No. 10, after setting out unit prices per yard for excess materials used by the contractor, provided space for the insertion of allowances required by the bidder under these capitalized, underlined words:

ALLOWANCES TO BE INSERTED BELOW BY THE BIDDER ARE TO BE BASED ON UNSHRUNK ELASTIQUE.

It was also made plain that the "Contractor will shrink and refinish the cloth before cutting."

Plaintiff inserted in its bid form estimates of how much cloth it would require for the various sizes of uniforms.

The form also included (Sheet No. A–5) a paragraph on "Excess Materials," which authorized the defendant to charge the contractor the value of cloth required in excess of the quantities provided by the stated allowances at prevailing Government prices plus 10% to cover the cost of packing, handling, etc.

On August 11, 1942, plaintiff was awarded a contract for 12,000 two-piece uniforms at a unit price of $18.00 and a total contract price of $216,000.00. The Schedule of Supplies (Sheet No. 3) included this provision, again capitalized and underlined:

ALLOWANCES BASED ON UNSHRUNK ELASTIQUE. ALLOWANCES FOR UNSHRUNK BARATHEA WILL REQUIRE 4% OF REDUCTION IN ALLOWANCES STATED FOR UNSHRUNK ELASTIQUE.

Sheet No. 7 included these words similarly set out:

CLOTH FURNISHED BY THE GOVERNMENT TO BE USED IN THE MANUFACTURE OF THESE GARMENTS WILL BE UNSHRUNK. CONTRACTORS MUST HAVE CLOTH SHRUNK AND REFINISHED BEFORE MANUFACTURING THE GARMENTS.

The bid form provisions relating to "Excess Materials" was then incorporated by reference and made a part of the contract.

The terms and conditions of the contract remained unmodified except for Change Order "A" dated October 23, 1942, changing thread specifications resulting in a decrease in the unit price per uniform from $18.00 to $17.95, and a net decrease in the contract of $600.00.

Plaintiff's bid was made by its superintendent who, prior to making the bid, had read the specifications and according to the evidence disregarded their plain requirements by basing his calculations upon quantities of shrunk cloth. Plaintiff now contends that the superintendent made a mistake by making up its bids on the basis of a custom of the trade which had previously required calculations for cloth for clothing to be made on the basis of shrunk goods.

On October 30, 1942, plaintiff wrote defendant that it would require additional yardage but said nothing with reference to a mistake having been made. Defendant replied that it would furnish the material and charge it to the plaintiff. On November 7, 1942, the plaintiff wrote in response to the Government's letter that no charge should be made because the extra yardage was required on account of changes ordered by the Quartermaster. Again nothing was said about a mistake.

On November 12, 1942, plaintiff's superintendent was advised by a representative of the Quartermaster Depot over the telephone that the additional yards of cloth would be shipped to plaintiff and charged to its account. Again, plaintiff said nothing about a mistake, nor did it at any time later so advise the War Department.

After the contract was completed, plaintiff wrote the Comptroller General for relief. After an investigation of the claim the General Accounting Office sent plaintiff a settlement certificate holding plaintiff liable for the charges. Upon receipt of this, plaintiff asked the Comptroller General to review the case and under date of July 16, 1945, this officer sent plaintiff a decision affirming his prior decision.

Plaintiff consumed an additional 2,112⅛ yards of cloth for which defendant charged the plaintiff and deducted from moneys otherwise due plaintiff under the contract $12,354.03. This is the amount for which plaintiff now sues.

Plaintiff admits that it made a mistake in calculating the allowances of cloth on a shrunk instead of an unshrunk basis, but contends that it is entitled to recover because it says that defendant, by reason of the facts before it at the time the contract was awarded, was charged with knowledge that a mistake had been made and was thereby precluded from taking advantage of such mistake to plaintiff's detriment, citing Edmund J. Rappoli Company, Inc., v. United States, 98 Ct.Cl. 499; Kemp v. United States, D.C., 38 F.Supp. 568; Saligman v. United States, D.C., 56 F.Supp. 505, 507; Lange v. United States, 4 Cir., 120 F.2d 886, and Struck Construction Company v. United States, 96 Ct.Cl. 186, 221.

Plaintiff apparently is relying on the legal principle that "the offeree will not be permitted to snap up an offer that is too good to be true" particularly where the offeree should know that the terms of the offer are unintended or misunderstood by the offeror. I Williston on Contracts, 1936, § 94.

■ We do not believe that the facts of this case bring it within the scope of this principle. Both the invitation for bids and the contract itself set out in capitalized underlined wording that allowances were based upon unshrunk instead of shrunk quantities of cloth. To the superintendent of a well known clothing firm who had served in his capacity for thirty years must be attributed the ability to read and understand ordinary everyday language, especially as used in connection with bids and contracts with the United States Govern-

ment involving almost a quarter of a million dollars.

What plaintiff says in effect is that because it had never had a contract with the Government before, its superintendent could disregard, either intentionally or carelessly, the express language of the invitation for bids and the contract, substitute therefor a custom of the trade and hold the Government responsible.

Seven other clothing manufacturing firms submitted bids along with plaintiff. It is admitted that all of them, including plaintiff, were reputable, high-class firms of experience and standing in the industry. They were, in a sense, collaborating to fill the vital war-time need for army uniforms. It appears that a comparison of the bids submitted was not made by the Army contract authorities. While the evidence is not as satisfactory as it might be, we must conclude, as the commissioner did, that it was not the custom at the time plaintiff entered into the contract to compare the bids for allowances of material. Therefore, defendant could not have discovered any evidence of a mistake on plaintiff's part by such method.

Furthermore, it appears that the allowances of one manufacturer could not be compared with the allowances requested by others because different manufacturers cut their cloth differently. The plaintiff accounts for the variation in requests for material for identical sizes by different manufacturers on the ground that some manufacturers made a tight garment and some a loose garment—for example, Mavest, Inc. requested 3 yards, 22″ of material for a size 36 regular, whereas Timely Clothes, Inc. requested the same allowance for a size 37. Obviously this is true, but in our opinion it does not aid plaintiff's position as such variations would tend to make it more difficult to ascertain a mistake even upon close inspection of the bids.

While the defendant did furnish standard patterns to which each manufacturer's working patterns were required to conform, it appears from the evidence that variations did prevail between the amount of material required by different manufac-turers for seams, facing, lapels, shaping purposes, etc. In fact, we think the evidence shows that in order to determine whether an error had actually been made it would have been necessary to have had each particular firm's patterns. Furthermore, even had the contracting officer made comparison between the allowances asked by plaintiff and the various bidders, it is doubtful whether he could have discovered a mistake on plaintiff's part.

The cases relied on by plaintiff, and referred to above, are clearly disinguisable on their facts and are not in point. In the Rappoli case the court, in allowing the plaintiff to recover, pointed out that the mistake was discovered prior to the execution of the contract; that the plaintiff sought to withdraw its bid and was told by the Government that it had no desire to take advantage of plaintiff's mistake and that the mistake could be corrected if plaintiff did certain things. Plaintiff relied on the Government's representations and executed the contract and then the Government refused to abide by its promises. In the Kemp case, after the execution of the contract, plaintiff discovered that it had made a *gross* error in its bid and so informed the Government. The Government refused to allow plaintiff to void the contract. In that case the court found that the Army officer in charge admitted that he had been struck by the great discrepancy between plaintiff's bid and the bids of the other contractors. The court held that the discrepancy was sufficient to put the Government on notice that something was wrong.

The Saligman case, cited by plaintiff, is more nearly like plaintiff's case on the facts but it lends scant support to plaintiff's claim. In denying plaintiff's claim, the court found that the Government had no reason to suspect that plaintiff had made a mistake; that the "staff of experts" serving the contracting officer were employed for the benefit and protection of the Government against excessive bids and not for the benefit of the contractor; and that the Government is not charged with the burden of examining every low bid for possible error by the bidder. The mistake was dis-

covered after work had begun on the contract, and, on advice of the Legal Department of the Quartermaster Depot, plaintiff addressed its claim to the Comptroller General who rejected it.

In the case before us, the contract was not still executory when the mistake was discovered. The terms of the invitation and of the contract were entirely free from ambiguity. There is nothing in the circumstances of this case indicating that the Government either knew or had reason to know that the bidder had made a mistake. There was no fraud or concealment on the part of the Government, the contract was valid on its face and the plaintiff was not acting under fraud, misrepresentation, duress or undue influence. The plaintiff's superintendent in failing to read and consider the language of the invitation for bids and the contract was negligent. It has been generally stated that if a party to a contract is able to but does not read it, then he is negligent and cannot plead this negligence in his defense. Ellicott Machine Co. v. United States, 43 Ct.Cl. 469; I Williston on Contracts, § 35; V Williston on Contracts, §§ 1579, 1580; 17 C.J.S., Contracts, § 137, page 487. In this case the plaintiff's agent was not only able to read the contract but the evidence shows that he actually did read it, which in our opinion is even more reason why this negligence cannot be plead in plaintiff's defense.

[2] In its brief defendant makes the further contention that in any event plaintiff is barred from recovery by reason of its failure to proceed under Article 12 of the contract, whereas plaintiff argues that Article 12 has no bearing on the issues of this case. In view of what we have said above, it is not strictly necessary to dispose of this contention. However, we feel called upon to make the following comments. We agree with plaintiff that Article 12 is not applicable. That article provides, in part:

"Article 12. Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Contractor within 30 days to the Secretary of War or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with performance."

This article thus sets forth the procedure to be followed in the event of disputes arising under the contract concerning *questions of fact*. The terms and conditions of this contract are clear and unambiguous and the dispute in question is clearly not one of fact. Rather, the question is a legal one of whether, under the circumstances, the plaintiff is equitably entitled to reformation of its contract. The contracting officer had no authority under any article of the contract to determine such a question and plaintiff's course in addressing its claim to the Comptroller General, and then to this court, was the proper one. However, in this case, neither the requisite of mutual mistake to justify reformation, nor the gross and obvious unilateral mistake by which the other party should not be allowed to profit, are present.

The plaintiff's petition should be dismissed. It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.