## BRISTER & KOESTER LUMBER CORPORATION v. UNITED STATES.

### No. 48598.

United States Court of Claims.

June 5, 1950.

E. E. Blakely, Washington, D. C., for the plaintiff.

S. R. Gamer, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

In 1941 the Government, through the Bureau of Yards and Docks, Navy Department, entered into a cost-plus-fixed-fee contract with three corporations, acting jointly, for the construction of certain projects at New River, North Carolina, including barracks, utilities, and various other training facilities for the Marine Corps. The estimated cost was approximately $13,000,-000, and Article 25 of the contract provided that the Government would pay to the prime contractors "the sum of the actual net cost to the Contractors of the materials actually furnished and the services and labor actually performed under the terms of this contract plus a fixed-fee amounting to $400,000." Other provisions of this contract pertinent to this case are set forth in finding 2. Article 1 provided that a naval officer would be designated by the Government as "Officer in Charge" and that such officer, "under the direction of the Contracting Officer, shall have complete charge, on behalf of the Government, of the work under this contract in the field." Article 9(a)

specified that "All materials required for the accomplishment of the work under this contract shall be provided by the Contractors," and subparagraph (b) provided that, except in certain circumstances, "No purchase contract or order in excess of $500 shall be made or placed [by the contractors] without the prior approval of the Contracting Officer or his authorized representative."

The prime contractors established a purchasing department and placed Robert N. Hunter, one of their employees, in charge thereof as purchasing agent. The Government designated Commander Madison Nichols, an officer of the Navy Department, as the Resident Officer in Charge under Article 1 of the contract, and during the time here involved he was in immediate charge, on behalf of the Government, of the work under the contract as the authorized representative of the contracting officer.

Certain subcontracts were made by the prime contractors with the approval of the Government, under Article 9(c) of the prime contract. One of these subcontractors was the George W. Kane Company, which had a subcontract for the construction of housing facilities. The Kane Company required certain lumber millwork and, in September 1941, its construction manager, John A. Timberlake, requested the prime contractors' purchasing agent Hunter to procure 24 items of this material. The prime contractors issued a written invitation for unit price bids for this material (finding 4).

On September 23, 1941, the plaintiff, a New York corporation with its principal office in New York City, submitted a unit price bid to the prime contractors through its authorized agent George C. Brown of Greensboro, North Carolina. The facts relative to the procedure followed in the issuance of invitations for bids and the awarding of contracts by the prime contractors are set out in finding 5. Eight bids were received and the plaintiff was the lowest bidder. Finding 6. The primary interest of the Government in requiring that its President Officer in Charge approve purchase orders for materials issued by the prime contractors was to make sure that the

contractors complied with Navy regulations, relative to competitive bidding and awarding contracts to the low bidder.

Hunter and Timberlake, representing the prime contractors, had some doubt as to whether the plaintiff was in a position to supply the lumber millwork for which plaintiff's representative Brown had submitted plaintiff's bid. From previous experience, Timberlake, representing the Kane Company, knew plaintiff as a reliable supplier of dimension and framing lumber, but he had never known plaintiff to submit a bid for fabricated millwork since this was not the kind of lumber normally handled by plaintiff. In addition, on previous orders submitted by plaintiff deliveries had not been made in accordance with promises made by plaintiff's representative Brown. Hunter and Timberlake noticed that plaintiff's bid was considerably lower than the next lowest bid, but they did not consider that plaintiff's bid was abnormally low, and they had no question in their minds about the bid on that ground; neither did Commander Nichols.

After Hunter and Timberlake had discussed the bid with Commander Nichols, Timberlake, by telephone, discussed the bid submitted by Brown with plaintiff's president, M. C. Brister, in New York (finding 8), and Brister stated that plaintiff would stand behind the bid as submitted by Brown. Timberlake also discussed the bid with Brown. Brister had another of plaintiff's representatives, a Mr. Morris, come to see Timberlake and discuss the bid with him. After this discussion, Morris advised Timberlake that plaintiff did not wish to withdraw the bid but desired that it stand as made. As a result of these discussions, the prime contractors decided to award the contract to plaintiff and recommended to Commander Nichols that he approve the purchase order for the specified quantity of materials in the total amount of the unit prices bid by plaintiff. Such purchase order was accordingly approved in the total sum of $18,462.74 (finding 9).

During November and December 1941, plaintiff delivered certain of the materials called for by its contract with the prime contractors and received payments therefor totaling $17,285.34. During January 1942, it failed to deliver certain quantities within the time required and, in accordance with the contract, the prime contractors purchased such materials in the market and charged plaintiff with the excess cost thereof in the sum of $560.58. This charge was later canceled, as stated in finding 15, by the prime contractors. The balance of the materials called for in the contract was delivered by plaintiff during January, February and March, and the contract was fully performed on March 18, 1942. On March 20, 1943, the prime contractors sent plaintiff a check for $818.57, (finding 15) representing the balance due plaintiff under its contract after deducting the amount of $17,285.34 paid and the amount of the contract unit prices for materials purchased in the open market.

Plaintiff refused to accept this check and returned it in view of its claim and invoice for $3,959.68 in excess of the total ($18,462.74) of the unit prices set forth in the contract. This claim that the contract price for the materials furnished should have been $22,422.42, was based on the ground that plaintiff's agent, George C. Brown, had made certain mistakes in the bid submitted, in that he had submitted erroneous unit prices for the materials called for in items 19 to 22, inclusive, in the bid schedule of the invitation for bids. The claim represented a recomputation and increase of these unit prices (findings 12 and 13). In May 1942, these unit prices were again recomputed in a new invoice and the claim was reduced to $2,415.81 (finding 13, last paragraph). The plaintiff also submitted its claim for $2,415.81 to Commander Nichols, Resident Officer in Charge, and Commander C. W. Porter, the Government's Officer in Charge of Construction, at Norfolk, Virginia. Porter was the superior of Nichols.

Plaintiff's claim was denied by the prime contractors and by Commander Porter. Plaintiff also submitted its claim to the Chief of the Bureau of Yards and Docks, Navy Department, who was the contracting officer; to the Board of Appeals, Office of Contract Settlement, and to the Secretary

of the Navy, and asked that it be allowed and paid on the ground that the errors complained of were obvious; were known to the representatives of the prime contractors and the Government at the time the bid was opened and examined, and that in a telephone conversation, on or about September 24, 1942, with plaintiff's president, M. C. Brister, a representative of the Government (whose name could not be given), discussed the errors in the bid and stated that the administrative details of correcting the errors could be accomplished after shipment of the lumber and that the Government "would take whatever steps required or necessary for correcting the errors in the bid." The contracting officer, the Board of Appeals, and the Secretary of the Navy, denied the claim on the ground that there was no basis in fact or in law for the allowance thereof (findings 16-20).

The ground, above referred to, on which plaintiff asks judgment against the Government is set forth in paragraphs III and IV of its petition. Plaintiff states its claim in paragraph VI of the petition, as follows: "The millwork covered by items 19 to 22, inclusive, were [sic] recomputed by the plaintiff on a piece basis instead of the erroneous lineal foot method and invoiced separately. After recomputing items 19 to 22, inclusive by the correct method, and after giving effect to quantities actually delivered, the plaintiff invoiced the defendant for the sum of $3,354.50. After recomputing items 19 to 22, inclusive, correctly, the bid of the plaintiff is still some five hundred odd dollars lower than the next lowest bid."

In its reply brief plaintiff states the basis on which it has computed its claim, as follows: "Items 19, 20, 21, and 22, called for prefabricated pieces of millwork. In order that each piece of millwork could be fabricated, a given number of lineal feet of material, plus the work of fabrication was required. The total quantity of this material in lineal feet, converted into prefabricated pieces, times its value at the scales of prices used in the other Items, not in error, is $3,959.68. From this amount there has been deducted the back charges of $186.86 and

$373.72, plus the original correction in plaintiff's lump sum bid of $48.26."

■ From the foregoing statement of the facts and circumstances surrounding the making of plaintiff's bid and the contract and with reference to the nature and basis of plaintiff's claim, it is plain that there was no contractual relationship whatsoever between plaintiff and defendant, and this suit must, therefore, fail for lack of privity of contract. Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643; Continental Illinois National Bank et al. v. United States, 81 F.Supp. 596, 112 Ct.Cl. 563; Petrin et al. v. United States, 90 Ct.Cl. 670; H. Herfurth, Jr., Inc., v. United States, 89 Ct.Cl. 122. The fact that the Government, under its contract with the prime contractors, was obligated to make reimbursement to the contractors of any payments they were required to make to plaintiff for materials, because it was a "cost-plus" contract, does not establish privity of contract between plaintiff and the United States. United States v. Driscoll, 96 U.S. 421, 24 L.Ed. 847; State of Alabama v. King & Boozer et al., 314 U.S. 1, 12, 13, 62 S.Ct. 43, 86 L.Ed. 482, 140 A.L.R. 615.

■ Had contractual relationship existed between plaintiff and the Government, the plaintiff would not, on the facts, be entitled to recover. The contracting officer found that "There exists no basis for the contention by the claimant, that the Navy Department or the war contractor promised to reform the bid of claimant prior to execution of the subcontract." The Officer in Charge of Construction and the Secretary of the Navy reached the same conclusion, and, as set forth in finding 22, the evidence before the court establishes correctness of these findings and decisions. Moreover, the plaintiff had every opportunity to examine and correct its bid and even to withdraw it before it was accepted. The prime contractors suggested to plaintiff, on at least three occasions, that it withdraw the bid which Brown had submitted, because they thought plaintiff would have difficulty in delivering the lumber millwork called for, but plaintiff refused to do so. No discussion was ever had as to possible errors in any

of the unit prices submitted. Brown was plaintiff's duly authorized representative and agent, and assuming that Brown may have made an error in bidding on items 19 to 22 in the invitation for bids, it is well settled that a bidder who makes an error in its bid or erroneously computes certain unit prices cannot, under facts such as are shown by the record in this case, plead this negligence or error in its defense after the bid has ripened into a contract. Hyde Park Clothes, Inc. v. United States, 84 F.Supp. 589, 114 Ct.Cl. 424.

On the whole record, we think Brown did not make any errors when he entered the unit prices bid for the specified pieces of shelving lumber, but deliberately and knowingly entered the unit prices in question on items 19 to 22, inclusive. The plaintiff has not shown by its proof that the unit prices submitted by Brown on items 19 to 22 were regarded or intended by Brown to be unit prices per lineal foot rather than unit prices per piece, as clearly stated in the schedule and invitation. The fact that the unit prices bid by Brown may have turned out to be too low, or that Brown may not have taken into consideration all the things that he should have considered in arriving at these unit prices on the basis of "pieces," as appears to be the real basis of plaintiff's claim, affords no ground for recovery of different and higher unit prices. Hyde Park Clothes, Inc. v. United States, supra.

From a study of the record, we think the prime contractors were very liberal with plaintiff when they relieved it of the payment of the excess cost of $560.58 for certain amounts of the lumber called for in items 19 to 22 of the contract, which they had to purchase in the open market due to plaintiff's failure to furnish such material within the time required. The prime contractors bore this expense themselves.

The balance of $818.57 which was tendered by the prime contractors and refused by plaintiff is not involved in this case.

The plaintiff is not entitled to recover and its petition is dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, concur.