RONALD E. CREAMER, Ind. & t/a Weinberg & Green
et al. v. CHARLES HELFERSTAY et al.

[No. 270, September Term, 1980.]

*Decided November 13, 1980.*

The cause was argued before WILNER, COUCH and WEANT, JJ.

*J. Alan Galbraith,* with whom were *Wilbur D. Preston, Jr., Richard C. Whiteford, M. Natalie McSherry* and *Whiteford, Taylor, Preston, Trimble & Johnston, Brendan V. Sullivan, Jr., Michael S. Sundermeyer* and *Williams & Connolly* on the brief, for appellants.

*David Freishtat,* with whom were *Paul Mark Sandler* and *Freishtat, Schwartz & Sandler* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

On July 9, 1976, a Declaration was filed in the Superior Court of Baltimore City that touched off this long, complex, bitter, and most unfortunate litigation. The docket entries alone, to this point, comprise 47 pages, giving some indication of the time, effort, and expense invested by the parties, their counsel, and the court. And there has yet been no trial on the merits.

It is not necessary, in this appeal, to recount the underlying charges and counter-charges in any significant detail. Suffice it to say that, as of October 15, 1979, the case was in this posture:

(1) In a Second Amended Declaration, four individuals who had been partners in a venture known as Route 29—Lewis Property (RLP), on behalf of themselves and 24 of their co-partners, sued Weinberg & Green (W&G), a Baltimore law firm, alleging negligence (Count I), breach of

contract (Count II), and fraud (Count III) arising from the manner in which the firm dealt with RLP, its property, and certain of its partners.[1]

(2) In a counterclaim, W&G sued seven of the plaintiffs, including one of the four "real" plaintiffs (Helferstay), alleging, in essence, that, to the extent W&G acted in such manner as to cause loss to the plaintiffs, it was because the counter-defendants failed to disclose certain information to W&G that would have allowed or caused the firm to take alternative courses of action.

Although W&G was by no means enamored with the charges of negligence or breach of contract, it not unexpectedly took the sharpest exception to the claim of fraud. Indeed, W&G formed and made clear a determination not to discuss, or even to consider, settlement of the litigation so long as the allegation of fraud remained extant. It was a matter of strongly felt principle, or, as W&G puts it, an "implacable resolve."

This resolve, though understandable, was nevertheless a significant stumbling block to any settlement negotiations. The plaintiffs had made their own "implacable resolve" — not to accept less in settlement than substantial reimbursement for their losses, *after* payment of attorneys' fees. In other words, they demanded "to be made whole." The problem was that the expense of the litigation made it uneconomical for the plaintiffs to pay their attorneys on an hourly basis, and so they agreed to a contingency fee arrangement based on the amount of ultimate recovery — initially 40%, subsequently increased to 50%. Thus, in order to achieve their economic goal of near total recoupment, they would have to effect a recovery nearly twice that which would accrue from compensatory damages alone. Only through the fraud count, from which substantial punitive

---

1. Although all (or most) of the partners of RLP were joined as parties plaintiff (apparently in response to a motion by W&G), it seems clear that their interests and motivations are not identical. For purposes of this appeal, we may consider only the four first named — Helferstay, Pace, Sass, and Bluefeld — as being the plaintiffs truly prosecuting this action. W&G is not alone in the defendants' column; there are fifteen codefendants who were sued for their respective alleged roles in the transactions complained of. In this appeal, we are concerned only with W&G.

damages might be recovered, could that result possibly be achieved. The negligence and contract actions, which, even if successful, would produce neither reimbursement for attorneys' fees nor punitive damages, would simply not suffice in that regard.

Thus, it was that two immovable objects were in stalemate. The plaintiffs needed the fraud claim to achieve their minimum objective and the defendant (W&G) refused even to consider a settlement with that claim open.

This was the situation on October 15, 1979, when the parties appeared before Judge David Ross in connection with certain pretrial matters. Facing the prospect of a four-month trial, Judge Ross suggested a possible "framework of a settlement" — that "if the plaintiffs were to, in effect, confess not guilty as to fraud allegations . . . [t]hat might open up the opportunity to settle on the claim of negligence."

The parties pursued that suggestion. At the invitation of W&G, the parties, and their counsel, met on October 23, 1979; and, after some four hours of discussion, they arrived at what they thought would be an appropriate mechanism to resolve the impasse, and thus the litigation. The agreement reached, which was committed to writing and signed the next day (October 24), was in five parts, as follows: [2]

(1) The plaintiffs agreed to release W&G from any claim of fraud or conspiracy and to dismiss, with prejudice, Count III of their Declaration, in which such claims were made.

(2) W&G agreed to dismiss, with prejudice, its counterclaim, and to release all counter-defendants from any claim related to RLP.

(3) W&G agreed to forebear and release the plaintiffs from and with respect to any claim W&G might have against them for malicious prosecution or abuse of process arising out of the litigation.

---

2. Actually, there were several individual documents signed by the different plaintiffs, but they were essentially identical. We shall refer to them collectively in the singular because, in reality, there was but one agreement.

(4) W&G "further agree[d] to enter into good faith settlement negotiations with respect to Counts I and II of the Second Amended Declaration immediately upon execution of this Agreement . . . and the filing of notices of dismissal by all parties."

To "facilitate settlement negotiations and as evidence of its intent to enter into good faith negotiations," W&G agreed (i) that its independently retained counsel, Williams & Connolly, and the two W&G partners most directly involved in the litigation (Messrs. Creamer and Garfink) would withdraw from participation in the settlement negotiations, and (ii) that W&G would be represented in the negotiations by Howard Miller, a W&G partner, and by Richard Whiteford and Natalie McSherry, members of the firm retained by W&G's liability insurance carrier in connection with the malpractice claim.

(5) An "integration" clause, worded as follows: "This Agreement . . . and various Notices of Dismissal [attached as exhibits] constitute the entire agreement of the parties. There are no additional promises made by the parties except those expressly set forth in this agreement."

With this Agreement, the parties also signed the dismissals called for in paragraphs 1 and 2, these being filed with the court on Thursday, October 25, 1979. Negotiations, of a sort, commenced that same evening, with a 2½ hour meeting between David Freishtat, counsel for plaintiffs, and Miller, Whiteford, and McSherry, representing W&G. A second session was held the next day, Friday. Both of those meetings were taken up largely with an explanation by Freishtat of the plaintiffs' version of the facts of the case for Miller's elucidation and benefit; there was little discussion of "dollars," and no offer of money was made by or on behalf of W&G. At a third session, on Sunday morning (October 28), Miller presented an offer of $80,000.

Freishtat, believing such an offer to be not only wholly unacceptable but an indication of bad faith on the part of W&G, immediately terminated the meeting, ended all discussion of settlement, and, the next day, moved to rescind

the agreement of October 24 and to strike the dismissals filed pursuant to it. After an evidentiary hearing, the court granted that relief. On December 31, 1979, it entered an Order, accompanied by a Memorandum Opinion, rescinding the October 24 agreement and striking the dismissals filed on October 25 pursuant to it. What is before us now is W&G's appeal from that order.

In considering the issues raised by W&G, it is, of course, important to understand why the court acted as it did. Only then can we determine whether it committed reversible error in its findings of fact or in its conclusion and application of law.

The crux of the problem, as noted, was the conflict of "implacable resolves" pertaining to the fraud claim. Plaintiffs contended that they made crystal clear to W&G both before and during the October 23 negotiating session, and that W&G fully understood, that plaintiffs would not abandon the fraud claim unless assured of a recovery well in excess of that which, at best, could flow from the negligence and contract actions. In that regard, they advised W&G that the amount needed to provide full compensation, after attorneys' fees, was $550,000, whereas the maximum recovery under the non-fraud counts was only $275,000, which, for purposes of settlement, was wholly unacceptable. The fraud claim was viewed by the plaintiffs as the "leverage" to achieve their minimum demands. W&G, on the other hand, would not discuss "dollars" in any way until the charge of fraud was formally withdrawn.

This dilemma was resolved, according to the plaintiffs, by W&G intimating to them, in unmistakable fashion, that "dollars" were not a problem. If the fraud claim were withdrawn, W&G indicated, the negligence claim could be settled "on a business basis" — i.e., taking into account not the merits of the claim but rather the cost to W&G of defending it. That cost, everyone agreed, would substantially exceed the maximum recovery (and thus exposure to W&G) if plaintiffs prevailed at trial on the non-fraud counts. Taking into account the cost of attorneys'

fees and the loss of productivity of W&G partners in a four-month trial, not to mention possible appeals, it was estimated by both sides that the cost of defense to W&G would range from $375,000 to over $500,000. Thus, a settlement effected on that basis could produce a recovery in excess of the value of the non-fraud counts on their merits and within a range acceptable to the plaintiffs.

This, plaintiffs asserted, was the *quid pro quo* for their agreeing to give up their "leverage" — the promise by W&G to negotiate the remaining claims on a "business basis," understanding that the minimum acceptable figure would have to be one that, after payment of attorneys' fees, would substantially reimburse the plaintiffs for their losses.

Thus, according to the plaintiffs, a two-step process was envisioned. First, the fraud count would be dismissed (along with W&G's counterclaim), thereby enabling the parties to discuss "dollars"; then, in quick fashion, the remaining counts could be resolved on a "business basis." This understanding, they said, could not be reduced to writing in so precise a fashion because of W&G's sensitivity as to the public perception of such an arrangement; an express agreement to negotiate the negligence and contract actions on a "business basis" would lend the appearance of indirectly settling the fraud claim as well. It was for that reason, plaintiffs contended, that (1) the promise was couched in terms of "good faith settlement negotiations" rather than language more specific, and (2) W&G insisted on an "integration" clause — paragraph 5, disclaiming any "additional promises" not "expressly set forth in this agreement."

When, the following Sunday, Miller returned with an offer of $80,000, well below even the $275,000 which W&G had previously been told was unacceptable, the plaintiffs concluded either that there had never been a true meeting of the minds over what "good faith settlement negotiations" meant, or that W&G had breached its covenant. That is what led to its "Motion for Appropriate Relief."

The court, after considering testimony from the

250

participants comprising 960 pages of transcript (plus a 68-page deposition) and countless pages of exhibits and legal memoranda, concluded, in relevant part, that,

(1) When the plaintiffs agreed to W&G's proposal on October 23, and the written agreements of October 24, "they and Freishtat honestly thought that Weinberg & Green intended to negotiate settlement of the two remaining counts of the declaration solely on the basis of the economic factors of cost of defense and loss of productivity to Weinberg & Green during trial for an amount within the range of something more than $275,000 but less than $550,000 and but for this understanding they would not have entered into the agreement."

(2) "This understanding of the plaintiffs was induced by the statements and conduct of those representing Weinberg & Green at the October 23 discussions."

(3) "The plaintiffs arrived at their conclusion regarding Weinberg & Green's intention as a result of the failure of anyone on behalf of Weinberg & Green to clearly state that the settlement range suggested by Freishtat's statements as to the $275,000 and $550,000 figures was out of the question and the affirmative statements made on behalf of Weinberg & Green. . . ."

(4) "The plaintiffs' understanding as to Weinberg & Green's intention had a reasonable basis." Moreover, "it would not have been unreasonable for Weinberg & Green to have concluded that it made good business sense to settle the case for an amount which was less than the total cost of defense and the exposure on the negligence and contract counts of the declaration even though that amount might be greater than the exposure alone on the negligence and contract counts of the declaration."

(5) Witnesses for W&G denied that "they intended to negotiate solely on an economic basis within a given range of amounts," and further denied "that their conduct on October 23 was intended to, or in fact did, indicate such an intention on their part." In light of that testimony, "it is

apparent that the plaintiffs were mistaken as to Weinberg & Green's intention."

(6) There is no evidence of intentional misrepresentation.

(7) Rescission may be ordered where there is justifiable reliance upon an innocent misrepresentation of a material fact. It may be ordered in a case of unilateral mistake if the four conditions set forth in *Mayor of Baltimore v. DeLuca-Davis Construction Co., Inc.,* 210 Md. 518 (1956), are satisfied. They are satisfied in this case.

(8) "Whether this case is treated as a form of honest misrepresentation or as one of a special class of unilateral mistake induced by the other party, the plaintiffs are entitled to rescission. The criteria for relief under either classification are satisfied by the facts."

Although the thrust of appellant's attack on the court's action is apparent, its articulation of the specific issues which it desires us to review is somewhat imprecise. It states as the general question presented for review "[w]hether an executed transaction, based upon a written and integrated contract that has been fully performed without breach, can be rescinded for 'mistake' that is not a mutual mistake." It then raises two "subsidiary" issues:

(1) "Whether negotiating statements that generated the asserted mistake were merged into the integrated contract under the parol evidence rule, and hence were not actionable upon performance of the contract because they could not be a basis for liability in equity in the absence of fraud, duress, or mutual mistake?"

(2) "Whether a theory of unilateral mistake, heretofore strictly a defense to suits in equity to enforce executory contracts, is available to rescind an executed transaction and, if so, whether such theory is applicable on the facts of this case?"

One problem with this statement of the issues is that it makes certain assumptions that are not necessarily valid. It

is not at all clear, for example, that the written contract, which required "good faith settlement negotiations" was, in fact, "fully performed," or that, despite the language of paragraph 5, the contract was completely integrated. A second complication is that the argument presented by W&G is not couched in language that is directly responsive to the issues raised. W&G frames its argument to us as follows:

> "I. Rescission Cannot Be Sustained On An Honest Misrepresentation Theory
>
>   A. There Was No Misrepresentation
>
>   B. Honest Misrepresentation Theory Is Not Applicable As A Matter of Law
>
> II. Rescission Cannot Be Sustained On a Unilateral Mistake Theory."

Attempting to integrate the argument made with the questions presented, and then relating it all to what the court below said and did, it appears to us that the real issues presented are these:

> (1) Did the court properly admit and consider parol evidence pertaining to the antecedent negotiations in light of the written agreement, the "integration" clause included in it, and the parol evidence rule?
>
> (2) If such evidence was properly before the court, were the court's factual conclusions clearly erroneous?
>
> (3) If the court was not clearly erroneous in its findings of fact, did it, through the misconstruction or misapplication of law, err in rescinding the agreements and striking the dismissals?

### Parol Evidence

The first of these restated issues is, of course, a threshold one, for it was the evidence relating to the settlement

negotiations occurring on October 23, 1979, that formed the basis of the court's ultimate findings of fact.

The parol evidence rule was succinctly defined in *Glass v. Doctors Hospital, Inc.,* 213 Md. 44, 56 (1957): "Stated broadly, the rule is that as a matter of substantive law, parol evidence is inadmissible to vary, alter or contradict a writing which is complete, unambiguous and valid, where no fraud, accident or mistake is claimed." This very statement of the rule suggests its limitations. As pointed out in *Whitney v. Halibut, Inc.,* 235 Md. 517 (1964), and again in *4500 Suitland Road Corp. v. Ciccarello,* 269 Md. 444 (1973), the rule has no application and does not serve to bar parol evidence with respect to "issues such as: (1) have the parties made a contract; (2) is that contract void or voidable because of illegality, fraud, mistake, or any other reason; (3) did the parties assent to a particular writing as the complete and accurate 'integration' of that contract...." *4500 Suitland Road Corp., supra,* at 451.

The proceeding triggered by plaintiffs' motion raised those issues, of course. The motion itself specifically alleged that the written agreement was fraudulently induced; the collateral issues of whether there ever was a meeting of the minds, whether there was a mistake (either a mutual or a unilateral one induced by W&G), and whether W&G breached the agreement arose during the subsequent course of the proceeding. The one question common to all of those issues, however, and the one truly central issue before the court, was the meaning of the term "good faith settlement negotiations." What precisely was it that W&G promised to do in exchange for withdrawal of the fraud claim? What was the bargain, the primal consideration expected in exchange for plaintiffs giving up their presumed "leverage"? Did the term (and thus the covenant) mean negotiations strictly on a "business basis" without regard to the "merits" of the remaining claims, as plaintiffs believed, or did it have a broader meaning, as W&G insisted. Upon that hinged the answer to all of the underlying issues raised in or by the motion.

In that light, it becomes clear that, in deciding whether to rescind the agreement, the court first had to interpret it, to determine what that covenant to enter into good faith settlement negotiations meant. Corbin states, in that regard (3 *Corbin on Contracts*, § 579):

"No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation it is determined what the writing means. The 'parol evidence rule' is not, and does not purport to be, a rule of interpretation or a rule as to the admission of evidence for the purpose of interpretation. *Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by oral testimony.*

"It is true that the language of some agreements has been believed to be so plain and clear that the court needs no assistance in interpreting. Even in these cases, however, it will be found that the court has had the aid of parol evidence of the surrounding circumstances. *The meaning to be discovered and applied is that which each party had reason to know would be given to the words by the other party. Antecedent and surrounding factors that throw light upon this question may be proved by any kind of relevant evidence.*

" . . . As long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue. *Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted. Nor is it made inadmissible by the fact that it has the effect of filling out the terms of a promise and of*

*determining the character and extent of the performance promised."* (Emphasis supplied.)

*See also* Corbin, § 580; 4 *Williston on Contracts,* §§ 629, 630; Restatement of Contracts, § 242; Restatement of Contracts 2d, § 240 (Tent. 1973).

This is clearly the law in Maryland. *See Lambdin v. Dantzebecker,* 169 Md. 240 (1935); *Applestein v. Royal Realty Corp.,* 181 Md. 171 (1942); *Vary v. Parkwood Homes, Inc.,* 199 Md. 411 (1952); *Eastover Stores, Inc. v. Minnix,* 219 Md. 658 (1959). Stated most succinctly in *Eastover Stores, Inc., supra,* at 666:

> "It is, likewise, just as broadly and consistently held that parol evidence is inadmissible to vary, alter or contradict a writing which is complete and unambiguous, where no fraud, accident or mistake is claimed . . . ; *but where doubt arises as to the true sense and meaning of the words themselves or difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and determined by evidence dehors the instrument."* (Citation omitted; emphasis supplied.)

*See also Burroughs Corp. v. Chesapeake Petroleum and Supply Co., Inc.,* 282 Md. 406, 411 (1978); *Canaras v. Lift Truck Services, Inc.,* 272 Md. 337, 348 (1974).

The simple fact, noted by Corbin, and by the Court of Appeals in *Lambdin, supra,* is that evidence offered to *explain* a term — the construction placed on it by reason of what was said, or implied, during the discussions and negotiations leading up to the contract — is not intended or effective to "vary, alter or contradict" the ultimate written agreement; and thus the parol evidence rule is simply not applicable to such evidence. This is true notwithstanding the inclusion in the written agreement of an "integration" clause. Because "such a clause itself may embody a recital of fact which may be untrue," it "is not invariably conclusive and its coverage is a matter of interpretation." *Rinaudo v. Bloom,* 209 Md. 1, 9 (1956).

It is clear, therefore, that, in light of the issues presented for resolution by the court — whether the agreement was induced by fraud or mistake, and what the nature was of the covenant to enter into "good faith settlement negotiations" — parol evidence of the antecedent discussions and negotiations, to the extent relevant to those issues, was not rendered inadmissible by the parol evidence rule. There being no other objection to it urged upon us, we find no error in its admission and use by the court.

### Evidentiary Support For
### Factual Conclusions

The evidence in support of plaintiffs' version of what occurred on (and after) October 23 came primarily through the testimony of Messrs. Freishtat, Sass, Pace, and Helferstay. Evidence on behalf of W&G came mostly from testimony by Messrs. Miller, Creamer, and Garfink, supplemented by testimony and written notes of Mr. Sundermeyer and Ms. McSherry, attorneys for W&G. Some of the evidence was in dispute; some of it was not.

The question, at this point, of course, is whether, upon the evidence — both conflicting and consistent — the facts found by the court are clearly erroneous. Maryland Rule 1086. In making that judgment, it is not our function to evaluate conflicts in the evidence or to adjudge the relative credibility of the various witnesses. That is the job of the trial judge, and we are not at liberty to second-guess him. We decide only whether there is any evidence legally sufficient to support the court's findings; and in making that decision, we must assume the truth of all evidence (and all favorable inferences fairly deducible from it) tending to support those findings. *Carling Brewing Co. v. Belzner,* 15 Md. App. 406 (1972).

Mr. Freishtat stated that he made clear to W&G, throughout the meeting of October 23, three basic points: (1) the plaintiffs would not settle the case unless "made whole" after payment of attorneys' fees, and would not withdraw the

fraud count, which was their "leverage," unless given some assurance that settlement of the non-fraud counts could produce that result; (2) it would take a gross recovery of approximately $550,000 to compensate plaintiffs fully for their alleged losses — to make them "whole"; and (3) $275,000, the maximum recoverable on the non-fraud counts (considered on their merits), was absolutely unacceptable.

In response to this, according to Freishtat, Brendan Sullivan, an attorney for W&G, said that, if the fraud count was dismissed, "they would be in the position to sit down and discuss this case on a business and economic basis." Sullivan thereupon presented the five-part proposal, involving dismissal of the fraud count, dismissal of W&G's counterclaim, W&G's agreement not to sue for malicious prosecution, withdrawal of Williams & Connolly, Garfink, and Creamer from further negotiations, and W&G's promise to enter into "good faith negotiations" to settle the non-fraud claims.

After consultation with his clients, Freishtat initially rejected the proposal. He told Sullivan that he placed no value whatever on withdrawal of the counterclaim, to which his clients had a good defense, or on a covenant to forebear suing for malicious prosecution, an action he believed to be groundless. Moreover, he saw no reason for Williams & Connolly to withdraw from the negotiations. As to the commitment to enter into "good faith negotiations," Freishtat responded that it amounted to asking the plaintiffs to buy "a pig in a poke" — that "it was a ridiculous proposal, that we could not assume the risks of dismissing the strongest aspect of our case, the fraud count, in exchange for a promise to sit down and negotiate with me." He repeated the need — the demand — "to be made whole," or substantially so, and the necessity of the fraud count to achieve that result.

Sullivan did not reject plaintiffs' demand to be fully compensated, or the assertion that it would take approximately $550,000 to do that. Mr. Miller, representing himself as the "financial man" at W&G who handled this

type of matter for the firm, interjected that W&G was anxious to settle, and that, if the fraud count was dismissed, "we would be able to settle the case on a business and economic basis." Dollars, he said, "are not the problem in settlement." W&G was a "multi-million dollar company" and could add its own resources to whatever its liability insurance carrier would contribute. The firm had been sued before, he said, and had "always handled these things in a business-like manner."

Sullivan, in effect, corroborated what Mr. Miller said. In Freishtat's words, he "indicated most strenuously, but *you're not giving up leverage,* and went on to indicate that dollars are not the problem in this situation." (Emphasis supplied.)

The merits of the case were never discussed;[3] Sullivan said it was not necessary to discuss them. Freishtat testified:

> "The tone of the meeting from the earliest conception was that the case would be settled on an economic, businesslike basis because the dollars required to defend the case were so astronomical and obviously in excess of a sum that we would accept in settlement. . . ."

Proposals and counter-proposals were made, the stumbling block being always the unwillingness of plaintiffs to give up their fraud claim in exchange for an uncertain promise and W&G's reluctance to discuss specific amounts in the face of the fraud charge. Sullivan, in a critical and emotional plea, "gesturing with his hands, and I [Freishtat] am quoting, if not for every word, almost, *can't you read between the lines, can't you see what it is we're trying to tell you. We want to settle. We understand what it takes. We can't do it in writing. We can't agree to the figure now, but we understand.*" (Emphasis supplied.) Once again, Miller

---

**3.** At one point, Freishtat asked Mr. Whiteford, representing W&G through its liability insurance carrier, what he thought of the negligence and fraud claims, and Whiteford opined that the plaintiffs would lose them both. That was the extent of any discussion of the merits of the plaintiffs' case.

repeated that "money simply isn't the problem." In Freishtat's view, Miller,

> "was telling in no uncertain terms that we [W&G] will settle this case on the terms that you are indicating if you only give us the chance; if you only gamble with us. In effect, that we are honest and truthful with you, *we will settle on the basis that we know will be satisfactory to you, but we can't put it in writing. We can't agree to it now, but give us the chance to show you.*" (Emphasis supplied.)

Believing W&G to be sincere, and apparently placing significance in Sullivan's plea to "read between the lines" and "see what it is we're trying to tell you," Freishtat, in the presence of W&G and its counsel, turned to his clients and said to them,

> "what Mr. Sullivan is telling you is that dollars are no problem to settle this case and he understands what it takes and what we need. But honor is the problem and the fraud count is the problem; that they have already budgeted their money to defend this case, so if they can get rid of the exposure by using the money already budgeted, it only makes sense that they would do so. . . ."

W&G, hearing this, made no response.

This testimony was corroborated in its material aspects by that of Messrs. Sass, Pace, and Helferstay, and by the handwritten notes contemporaneously made by Michael Sundermeyer, an attorney for W&G.

Based upon these oblique assurances, Freishtat advised his clients to accept the five-part proposal offered by Sullivan; and, upon that advice, they did so. "It was my understanding," he said, "that the protections that I had would be within the good faith settlement language, that good faith would encompass the settlement that had been made so clear to Weinberg & Green." Freishtat estimated W&G's cost of defense to be about $550,000 and, from

comments made during the discussions, assumed that Miller would reach about the same conclusion. He therefore further assumed that settlement of the non-fraud counts on a "business basis" would be quickly and easily forthcoming, there being no need to haggle over the merits of the claims.

Freishtat was quickly disabused of this latter assumption. At the first negotiating session, on Thursday evening (October 25), Miller wanted to learn about the merits of the case, much to Freishtat's surprise: "I indicated I was surprised at that approach, that it was not my understanding, it was not what we had discussed at the meeting at all, that the merits and the facts were not really the guts of our negotiations." Nonetheless, at Miller's insistence, Freishtat outlined the salient parts of his case. There was little discussion about money, and no offers in settlement were made.

The discussion, Freishtat said, continued in the same vein the next morning, with Miller listening to, and then beginning to question Freishtat about, the nature of the plaintiffs' case. Among the various topics discussed were three that assumed a particular significance later.

The first of these had to do with Roger Garfink, one of the W&G partners whose alleged acts and omissions with respect to RLP formed a major part of the plaintiffs' complaint, including their fraud claim. Miller observed at one point that, although W&G may have been "a trifle careless" or "sloppy," he did not see that Garfink had engaged in "this enormous fraud" alleged in the Declaration. Freishtat responded that he never viewed Garfink as having "knowingly planned to cheat anyone," but rather that "his actions constituted grossly reckless disregard for the interests of his clients and that was my judgment that that is sufficient to satisfy the necessary elements to prove fraud. . . ."

The second comment concerned one of the specific complaints made against W&G. It was alleged that, with the knowledge and assistance of W&G, a $52,000 broker's fee was fraudulently paid to two of the codefendants at the

expense of RLP, and that W&G had concealed that fact from the plaintiffs, to whom the firm had a duty to disclose it. Freishtat said that he told Miller, when that matter was discussed, that (1) he viewed it as one of great import, (2) it was stupid to have concealed the fee since, "*had it been disclosed rather than kept secret*" (emphasis supplied), the plaintiffs would likely have invested in the venture anyway, but (3) his clients would testify at trial that had they known *of the concealment* — that their associates "were hiding something from them" — they would not have invested.

The final matter of importance concerned the settlement the plaintiffs had effected with two accounting firms that had originally been joined as codefendants with W&G. In response to Miller's inquiry, Freishtat explained the factors that had induced the settlement. He mentioned the complexity of the case, the need for and expense of obtaining expert witnesses, problems of proving liability, possible deficiencies in his pleadings, possible difficulties in collecting any judgments that might be obtained, and the fact that the $70,000 received in settlement served, in part, to finance the battle against W&G, whom the plaintiffs considered to be the more culpable defendant.

Miller interpreted these comments in a way wholly unintended by Freishtat. He took the comment about Garfink as a concession by Freishtat that there was no fraud involved on the part of W&G — that the plaintiffs' fraud count was absolutely groundless; he gathered from what was said about the secret broker's fee that the plaintiffs would have invested in RLP in any event, but would testify differently, and thus perjure themselves, at trial; and he was upset that the accountants, whom he considered to be the more culpable defendants, had been let out for only $70,000.[4]

Laboring under these impressions, Miller, on behalf of W&G, decided that Friday to ignore the "costs of defense" as

---

4. W&G asserts in its brief that Miller's impressions were correct ones — that Freishtat either said or implied what Miller claimed to have heard. The court concluded otherwise, however, finding that "Miller misunderstood what Freishtat was saying." In light of Freishtat's testimony, we cannot say that that finding was clearly erroneous. Maryland Rule 1086.

a factor in negotiating settlement, and to evaluate the case solely on the basis of what he considered the merits to warrant. The "business basis" approach, based upon attorneys' fees and loss of productivity, Miller said, "went out the window." Instead, Miller proceeded by: (1) considering the fraud claim as worthless and attributing no value to it; (2) allowing $25,000 as "a ballpark number" with "[n]o real thought process" for the adverse publicity to W&G from a trial; (3) allowing $60,000 for loss of productivity of W&G attorneys in the event of a trial; and (4) assuming a $25,000 cost in the event of a second trial. This brought him to $110,000. The next day (Saturday, October 26), he reviewed what he considered to be the merits of the plaintiffs' case, figured a range of $75,000 — $100,000, and settled on $80,000.

Miller discussed all of this with Whiteford and McSherry. On Friday evening, Whiteford called Freishtat, apparently in confidence, and alerted him that "Weinberg & Green's understanding of good faith negotiations were [sic] different than my understanding of good faith negotiations." Whiteford was even more direct in a conversation the next day. Freishtat testified:

> "I asked Mr. Whiteford Saturday afternoon should I proceed to prepare the necessary papers to set this thing aside and Mr. Whiteford said to me, I will — I cannot advise you against that, which was clear enough, that I viewed it to be he understood that the figure coming in was one that would not begin to approach anything we could accept."

The bad news was delivered to Freishtat Sunday morning and, as noted, on Monday the motion to set the agreement aside was filed.

This evidence, coupled with the inferences that may fairly be drawn from it, when viewed in the manner required under *Carling Brewing Co. v. Belzner, supra,* clearly suffices to support the factual conclusions reached by the trial court (see paragraphs (1) through (6), *ante,* pp. 8, 9). At the very

least, it establishes a unilateral mistake on the part of plaintiffs as to how the non-fraud counts would be settled, a mistake induced by the representations of W&G.

The trial court accepted, as shall we, that there was no *intentional* misrepresentation, and therefore no fraud, on the part of W&G with respect to the settlement agreement. But, if Freishtat's testimony (and that of his clients) is to be credited, as at this juncture it must be, the plaintiffs were clearly and reasonably led to believe that, if they withdrew the fraud claim, the other claims would be settled, in good faith, on a "business basis," taking into account only the aggregate costs of defense to W&G and without regard to the merits of the claims. Moreover, they could reasonably have drawn the conclusion from what W&G said, and didn't say, that such a settlement would involve something more than the $275,000 they had already indicated would be unacceptable. If W&G was under a different impression, it did not clearly communicate its thinking to the plaintiffs, but rather allowed them to labor under a misimpression of what the firm intended "good faith settlement negotiations" to mean.

## Rescission As A Remedy

We come now to the ultimate legal issue presented in this appeal. Assuming (1) that the plaintiffs were mistaken in their understanding that the covenant to enter into "good faith settlement negotiations" meant that the negotiations would proceed solely on a "business basis," without regard to the merits of the non-fraud claims, and within a range in excess of the $275,000 already declared unacceptable; (2) that this mistake was a unilateral one on their part, in the sense that it was not shared in by W&G; but (3) that it was a reasonable interpretation induced by the statements (and silence when a response was indicated) on the part of W&G, was the Agreement subject to rescission on that account?

Unfortunately, because of the nearly endless variety of factual and procedural contexts in which the issue of

"mistake" has arisen and the occasional use of unnecessarily broad language by some courts in dealing with it, we are in one of those areas of the law that is not as clear as it should be. Certain guidelines and distinctions do emerge, however; and we find that some of the inconsistencies and confusion tend to fade away when the issue is viewed from these four perspectives: (1) in what procedural context does the issue arise — as a defense to an action for breach of contract, as the basis for an action to *reform* the contract, or as the basis for an action to *rescind* it; (2) what is the nature of the mistake — does it relate to a material term; (3) what role, if any, did the other party play in inducing the mistake, or in permitting the mistaken party to continue laboring under it — was the mistake a reasonable one or merely the product of carelessness; and (4) what would be the effect on the parties of granting the relief sought by the person claiming mistake?

Pomeroy (3 *Pomeroy's Equity Jurisprudence,* 5th Ed., § 870a) touches each of these bases and states the prevailing rule most succinctly:

"It is the rule in general that a contract will not be *reformed* for a unilateral mistake, nor does such a mistake, of itself render the transaction voidable. However, equitable relief *by way of rescission* may be given if the mistake relates to a material feature of the contract, if it is of such grave consequence that enforcement of the contract as made will be unconscionable, if it occurred notwithstanding the exercise of ordinary diligence by the party making the mistake, and if the other party can be put *in statu quo.*" (Emphasis supplied; footnotes omitted.)

The threshold distinction drawn by Pomeroy, of course, is between reformation and rescission; and it is an important one when the action is based on *unilateral* mistake. If the court *reforms* a contract by reason of a unilateral mistake, it imposes on the non-mistaken party an obligation or a term to which he never agreed and perhaps never contemplated; it remakes the agreement. This, the courts have declined to

do. As observed in *Gaver v. Gaver,* 119 Md. 634, 644 (1913), an action for reformation based on unilateral mistake:

> "This is, indeed, a very unfortunate case in as much as it appears the money of the infants will be lost to them, but we cannot relieve them of their loss, resulting from the misplaced confidence of their mother, *by placing upon the appellees a burden differing from that which they had agreed to assume and one which they are not legally required to assume.*" (Emphasis supplied.)

*See also Moyer v. Title Guarantee Co.,* 227 Md. 499 (1962), where the Court noted, at p. 504:

> "The request for the reformation of a written instrument is one for unusual relief, and when granted, it differs from rescission, cancellation or annulment ·of the document. Unlike these, the instrument remains in force and effect, but in a modified, or changed, form. . . ."

With rescission, of course, the contract is not remade; it is nullified, and the parties are merely placed back in their pre-agreement status. The non-mistaken party loses the bargain he thought he had, but he is not involuntarily subjected to one he clearly did not make and does not want. The distinction is a practical one. It has led courts to grant rescission based on unilateral mistake in situations where they would have refused to order reformation.

The Maryland Court first addressed the distinction in *Dulany v. Rogers,* 50 Md. 524 (1879), which involved a bill for reformation. The court observed, at p. 533:

> "It is incumbent . . . upon the party seeking to reform a written instrument to show by conclusive proof, that it does not embody the final intention of the parties; courts will not rectify it unless it was executed under a common mistake, — both parties having done that which neither of them intended. *A mistake on one side may be ground for*

*rescinding, but not for reforming a written agreement....*" (Emphasis supplied.)

*See also Brockmeyer v. Norris,* 177 Md. 466, 473-74 (1940); and *Hoffman v. Chapman,* 182 Md. 208, 213 (1943). That rescission may be granted upon proof of a unilateral mistake is no longer open to any doubt, if it ever was. *See Mayor of Baltimore v. DeLuca-Davis Construction Co., Inc.,* 210 Md. 518, 526 (1956): "Although reformation requires that the mistake be mutual, rescission may be granted whether the mistake be that of one or of both of the parties." *Also Baltimore County v. John K. Ruff, Inc.,* 281 Md. 62 (1977).[5]

The question thus becomes not the existence or availability *vel non* of the remedy, but rather the circumstances under which it may be granted. Essentially, they are those stated above by Pomeroy, although they have been couched in different language from time to time by the Court of Appeals. *See Gross v. Stone,* 173 Md. 653 (1938); *Hoffman v. Chapman, supra,* 182 Md. 208. What binds us now is the statement of the rule laid down in *Mayor of Baltimore v. DeLuca-Davis Construction Co., Inc., supra,* 210 Md. 518, 527, also quoted and applied in *Baltimore County v. John K. Ruff, Inc., supra,* 281 Md. 62, 66:

" 'The general rule as to the conditions precedent to rescission for unilateral mistakes may be summarized thus: 1, the mistake must be of such grave consequences that to enforce the contract as made or offered would be unconscionable; 2, the mistake must relate to a material feature of the contract; 3, the mistake must not have come about

---

5. *Compare Ray v. Eurice,* 201 Md. 115 (1952), where the issue of mistake was raised in defense to an action for breach of contract. Although the Court used some rather broad language in its discussion of the issue, it is apparent that the defense was rejected primarily because the mistake, if indeed there was one, was the product of the defendant's inexcusable negligence. *Compare also Bernstein v. Kapneck,* 46 Md. App. 231 (1980), involving an attempt to set aside a settlement agreement on the basis of mutual mistake after the agreement had been formalized by an enrolled judgment. The critical issue there was the court's revisory power under Maryland Rule 625 over enrolled judgments.

because of the violation of a positive legal duty or from culpable negligence; 4, the other party must be put *in statu quo* to the extent that he suffers no serious prejudice except the loss of his bargain.'"

The court below recognized the *DeLuca-Davis* test as the controlling one, and analyzed its four elements in the context of the findings it had made, concluding that each of the criteria was, or could be, satisfied. W&G attacks this approach on two fronts. First, it contends that *DeLuca-Davis* is not applicable at all because, despite the foregoing authority (to which it makes no reference), rescission is not a permissible remedy unless the contract is wholly executory; and second, it argues that even if the *DeLuca-Davis* test is applicable, the court erred in concluding that it was satisfied.

In support of its assertion that rescission is not available unless the contract is wholly executory, W&G cites a single sentence from 13 Williston § 1580: "The same principle that prohibits recovery of money paid after the defendant has changed his position makes it clear that whatever equity there may be in favor of one who has made a unilateral mistake in the formation of a bilateral contract, the effect of it is confined to cases where the transaction is still wholly executory." This rather broad statement, however, is not at all supported by the cases Williston cites as authority for it,[6] and, in the Court's judgment is not an accurate expression of the law. Certainly, the Maryland cases have created no such absolute limitation or condition on the remedy of

---

**6.** *See, for example, Hyde Park Clothes, Inc. v. United States,* 84 F. Supp. 589 (Ct. Cl., 1949), where a government contractor, through its own abject carelessness, overlooked or ignored a clearly stated specification in submitting its bid. After the contract — the manufacture of 12,000 uniforms — was fully complete, the uniforms made and delivered, the contractor sought an additional recovery. In denying the claim, the court observed that the contract was unambiguous, that the government neither induced nor knew of the mistake, that there was no fraud or misrepresentation, that the mistake was due solely to the contractor's negligence, and that the contract "was not still executory." That last element was by no means the basis of the court's decision. *See also M. F. Kemper Construction Co. v. City of Los Angeles,* 235 P.2d 7 (Cal., 1951), a case almost identical to *DeLuca-Davis, supra; Geremia v. Boyarsky,* 140 A. 749 (Conn., 1928); *C. H. Young Co. v. Springer,* 129 N.W. 773 (Minn., 1911).

rescission. *See, for example, Gross v. Stone, supra,* 173 Md. 653, where a fully executed transaction, involving a deed, was rescinded because of a unilateral mistake; *also Funger v. Mayor of Somerset,* 244 Md. 141, 151 (1966).

The question of whether the contract has been partially or wholly performed is a relevant one, but not in the sense W&G suggests. Its significance is in terms of the fourth condition laid down in *DeLuca-Davis* — whether, in light of what has already occurred, the non-mistaken party (W&G) can be placed *in statu quo.* That is the context in which we shall consider the question.

Given the findings of fact made by the trial court, it is clear that the four conditions for rescission laid down in *DeLuca-Davis* have been satisfied.

The mistake went to the very heart of the agreement. The plaintiffs were not exchanging their fraud count for a withdrawal of W&G's counterclaim, in which they placed no value, or for an indefinite promise to negotiate the balance of the case based upon what Howard Miller, one of the named defendants, thought the *merits* of it might warrant. That would, at best, have limited their recovery to $275,000. The plaintiffs gave up the one existing vehicle by which they could achieve their minimum demand upon the expectation that they would receive in return an alternative mechanism of equivalent value — the promise to negotiate on a "business basis" at a level exceeding $275,000. Their mistake, as to the meaning of the covenant to enter into "good faith settlement negotiations," in this light, was surely "of such grave consequences" to the plaintiffs "that to enforce the contract as made . . . would be unconscionable," and, equally clear, "relate[d] to a material feature of the contract." Conditions 1 and 2 were therefore met.

Condition 3 is that the mistake must not have arisen from culpable negligence on the part of plaintiffs. W&G claims that plaintiffs were "grossly negligent" in "accepting the risk" that "settlement discussions might not produce a dollar offer satisfactory to them." Indeed, it claims that plaintiffs were actually "reckless" in doing what W&G urged them to

do — to "read between the lines" and "see what it is we're trying to tell you." The short answer to this is that it ignores entirely the findings of fact made by the court, which we have concluded were supported by the evidence and therefore were not clearly erroneous. The evidence sufficed to show that the mistake was a reasonable one, induced by W&G, and that it was not, therefore, the product of culpable negligence. If Freishtat's testimony is believed, the plaintiffs' only error was in taking W&G at its word.

Finally, there can be little doubt, notwithstanding W&G's protestations, that Condition 4 is also satisfied. Rescission, including the striking of the orders of dismissal, will precisely place W&G *in statu quo,* with no prejudice other than the loss of its contemplated bargain. The time and effort expended by Mr. Miller in preparing himself for the three meetings with Mr. Freishtat, which have come to naught, hardly represents the type or degree of prejudice sufficient to deny rescission.[7]

> *Judgment affirmed; appellants to pay the costs.*

---

**7.** Prior to oral argument the Court denied a motion to dismiss grounded on Md. Rule 605 a. Clark v. Elza, 286 Md. 208 (1979).